**FINANCIAL GENERAL BANKSHARES, INC., Plaintiff,**

v.

**Eugene J. METZGER, Defendant.**

**Civ. A. No. 78–0276.**

United States District Court, District of Columbia.

July 31, 1981.

Edwin E. McAmis, Douglas M. Kraus, and Erskine Henderson, New York City, admitted pro hac vice, for plaintiff.

Michael E. Friedlander and Samuel S. Jones, Jr., Washington, D. C., for defendant.

## MEMORANDUM

GASCH, District Judge.

On November 19, 20, and 21, 1980, trial was held on allegations that defendant Eu-

gene J. Metzger breached fiduciary and ethical obligations owed to plaintiff Financial General Bankshares, Inc. (FG). Plaintiff charges that while serving as counsel to FG, Metzger engaged in several undisclosed attempts to seize or sell control of his client corporation. Plaintiff seeks $80,000 in compensatory damages, the amount alleged to have been paid for Metzger's legal services. FG also seeks punitive damages. The pertinent allegations are set forth in the fourth and fifth causes of action in plaintiff's May 19, 1980 supplemental amended complaint.

## I. *HISTORY OF LITIGATION.*

Plaintiff began this action on February 17, 1978 with a complaint and a motion for a preliminary injunction. The complaint set forth six causes of action based on the Securities Exchange Act of 1934 (1934 Act) (Counts I, II, and III), the Virginia Takeover Bid Disclosure Act (Count VI), and common law (Counts IV and V). In addition to Metzger, the complaint named as defendants Bert Lance; the Bank of Credit and Commerce International (BCCI);[1] Agha Hasan Abedi (Abedi), the president of BCCI; and Stephens, Inc. and its president, Jackson Stephens (collectively, the Stephens defendants).[2] Five Middle Eastern investors alleged to be clients of BCCI were named as defendants by amended complaint filed March 21, 1978.[3] These are Sheikh Kamal Adham (Adham); Faisal Saud Al-Fulaij (Al-Fulaij); His Royal Highness Sheikh Sultan Bin Zaid Al-Nahyan (Sultan); Abdullah Darwaish (Darwaish), in his individual and representative capacities; and His Royal Highness Sheikh Mohammed Bin Zaid Al-Nahyan (Mohammed), a minor. Plaintiff charged, in essence, that defendants had formed a secret group in 1977 to acquire control of FG and by January of 1978 had purchased approximately twenty percent of FG's outstanding common shares, without filing the disclosure statements required by federal and state law.

On April 27, 1978, the Court granted plaintiff's motion for a preliminary injunction, finding that FG had shown a likelihood of prevailing on its claim that the defendants had violated section 13(d) of the 1934 Act, 15 U.S.C. § 78m(d) (Count I). The five Middle Eastern investors and Stephens, Lance, Metzger, Abedi, and BCCI were enjoined from acquiring any further interest in or proxies for FG common stock until they offered rescission to the shareholders from whom they had purchased FG stock on the open market during December of 1977 and January of 1978. The Court dismissed plaintiff's causes of action arising under sections 14(d) and (e) and 10(b) of the 1934 Act (Counts II and III) and the Virginia Take-Over-Bid Disclosure Act (Count VI). *See Financial General Bankshares, Inc. v. Lance*, [1978 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 96,403 (D.D.C. Apr. 27, 1978).

Plaintiff filed a supplemental amended complaint on May 19, 1980, naming six additional defendants.[4] Two months later, all defendants remaining in the case, except Metzger, settled with FG and were dismissed by stipulation and order.[5]

On August 2, 1980, the Court entered summary judgment for Metzger on causes

---

**1.** As used throughout this memorandum, BCCI refers collectively to the Bank of Credit and Commerce International (Luxembourg), S.A., and the Bank of Credit and Commerce International (Holdings), S.A. In general, BCCI is a Luxembourg bank with a number of branches throughout the world, including in the United Kingdom and the Middle East.

**2.** Stephens, Inc. is an investment banking firm and registered broker-dealer located in Little Rock, Arkansas. Its subsidiary, Systematics, Inc., was named as a defendant but was dismissed on March 22, 1978.

**3.** The amended complaint also named as defendant LaBelle Lance.

**4.** The six were: Credit and Commerce American Holdings, N.V.; Credit and Commerce American Investment, B.V.; Mohammed Rahim Motaghi Irvani; Gulf Investment & Real Estate Co.; International Credit and Investment Company (Overseas), Ltd.; and Stuart Symington.

**5.** The stipulation and order was signed July 25, 1980. Two years earlier, on March 18, 1978, the Stephens defendants, Lance, Metzger, Abedi, BCCI, and the Middle Eastern investors consented to entry of judgments of permanent injunctions and other equitable relief in a suit filed by the Securities and Exchange Commission. The consents required any acquisition of FG's outstanding common stock to be made by

of action based on section 13(d) of the 1934 Act. The Court retained pendent jurisdiction over allegations of breach of fiduciary and ethical duties, the fourth and fifth causes of action in the supplemental amended complaint.

Thus, by the time of trial Metzger was the sole remaining defendant. At trial plaintiff sought to prove that from June of 1977 through January of 1978, while acting as counsel for FG, Metzger secretly (1) plotted to seize control of FG with other large shareholders; (2) attempted to generate interest in a plan to sell FG to a foreign bank at an enormous personal profit; (3) acted as agent for a group of Middle Eastern investors seeking to acquire a controlling share of FG stock; and (4) used a list of FG shareholders to identify and contact large shareholders potentially willing to sell to the Middle Eastern investors.

cash tender offer within one year. By a series of stipulations, that time has been extended to December 31, 1981. *See Securities and Exchange Commission v. Bank of Credit and Commerce International, S.A.,* Civil Action No. 78–0469 (D.D.C.).

6. Witnesses called by the plaintiff are J. William Middendorf, II, President and Chief Executive Officer of FG (Tr. Vol. I, at 4–145), and Jack Beddow, Senior Vice President and Secretary of FG (Tr. Vol. II, at 74–92). Defendant called Joseph Simpson Farland, former shareholder and director of FG (Tr. Vol. III, at 47–76), and Nathan M. Ewers, Jr., a partner in the law firm of Hunton & Williams (Tr. Vol. III, at 76–82). Eugene Metzger also testified on his own behalf (Tr. Vol. III, at 83–223).

7. The parties read into the trial record portions of 13 depositions, the entireties of which were received into evidence. The depositions are of Eugene Metzger (Tr. Vol. I, at 147–267; Tr. Vol. II, at 93–166; Plaintiff's Exh. 19); Abdul Sami, an officer of BCCI (Tr. Vol. I, at 269–309; Tr.Vol. I, at 3–74; Plaintiff's Exh. 22); George H. Davis, an officer of Stephens, Inc. (Tr. Vol. II, at 167–178; Plaintiff's Exh. 25); Bert Lance (Tr. Vol. II, at 178–206; Plaintiff's Exh. 20); Abedi (Tr. Vol. II, at 211–218; Plaintiff's Exh. 21); Thomas G. Wyman, former shareholder and director of FG (Tr. Vol. II, at 219–271; Plaintiff's Exh. 23); Jackson Stephens (Tr. Vol. II, at 272–290; Plaintiff's Exh. 24); Adham (Tr. Vol. II, at 301–320; Defendant's Exh. DDD); Al-Fulaij (Tr. Vol. II, at 323–331; Defendant's Exh. EEE); Darwaish (Tr. Vol. III, at 4–8; Defendant's Exh. FFF); William F. McSweeney,

At the conclusion of trial the Court directed counsel for both parties to submit proposed findings of fact and conclusions of law. These have been received as directed.

## II. EVIDENTIARY RECORD.

The evidentiary record derives from four general sources: pretrial stipulations entered November 17, 1980 (Pretrial Stips. ¶¶ 1–71); testimony heard [6] and depositions read at trial; [7] and the parties' exhibits.[8] Based on this evidence and in accordance with rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law:

## III. FINDINGS OF FACT.

### A. Parties.

1. Plaintiff is Financial General Bankshares, Inc., a federally chartered bank hold-

currently a director of FG (Tr. Vol. III, at 8–18; Plaintiff's Exh. 54); B. Francis Saul, II, now Chairman of the Board of FG (Tr. Vol. III, at 19–46; Plaintiff's Exh. 55), and William Cobb (Defendant's Exh. GGG).

8. The plaintiff's documentary submissions (Plaintiff's Exh. 1–56) include: a notice dated May 28, 1977 of FG's annual shareholder's meeting (Plaintiff's Exh. 1); a memorandum written by Metzger entitled "Where Do We Go From Here?" (Plaintiff's Exh. 7); a letter dated October 14, 1977 from Metzger to Hugh McColl, Jr. (Plaintiff's Exh. 4); McColl's response to the letter (Plaintiff's Exh. 5); copies of bills from Metzger and his firm to FG (Plaintiff's Exh. 8–15); copy of a check from FG to Metzger dated December 20, 1977 (Plaintiff's Exh. 16); and a list of open market and privately negotiated transactions in FG stock from December 20, 1977 to January 27, 1978 (Plaintiff's Exh. 6, 26, and 42).

Defendant's Exhibits A–HHH include: memoranda and letters from Middendorf to Metzger regarding the latter's work authorizations (Defendant's Exh. B, D, E, F, G, O, P); a memorandum from Metzger to Middendorf on the same topic (Defendant's Exh. C); minutes or notes of FG meetings held in June, October, November, and December of 1977 (Defendant's Exh. CCC, I, L, M); memoranda within FG regarding fees owed to Metzger's firm (Defendant's Exh. K, L); and an order dated November 25, 1977 of the Board of Governors of the Federal Reserve System (Federal Reserve Board) (Defendant's Exh. RR).

ing company incorporated in Virginia with its principal place of business in Washington, D. C. Pretrial Stip. ¶ 1. FG has twelve subsidiary banks engaged in commercial banking in Maryland, Virginia, New York, Tennessee, and the District of Columbia. Plaintiff's Exh. 56, at 39–47.[9]

2. Defendant is Eugene J. Metzger, an attorney in the law firm of Metzger, Shadyac & Schwarz (and its predecessor firms) in Washington, D. C. Metzger is a member of the Bar of the District of Columbia. Pretrial Stip. ¶ 2.

### B. Representation of Middendorf Investors.

3. Metzger's first association with FG was early in 1976 as attorney for a group of investors headed by J. William Middendorf, II.

4. In March of 1977, Middendorf hired Metzger to represent 28 investors in connection with the proposed acquisition of a block of FG common stock. Pretrial Stip. ¶ 27.[10] Middendorf had never met Metzger, but two members of his investment group had recommended Metzger as a good bank attorney on matters involving the Securities and Exchange Commission (SEC) and the

Federal Reserve Board. Tr. Vol. I, at 10–11, 151.[11]

5. The Middendorf investment group sought to purchase the FG common stock owned of record by International Bank (IB), FG's largest and controlling shareholder since 1958. Pretrial Stip. ¶¶ 3, 27; Defendant's Exh. RR, at 14–16. In March of 1977, IB owned of record 1,204,231 shares, a 22.2% interest. Plaintiff's Exh. 1, at 1.[12] IB sought to sell the stock to moot proceedings pending against it by the Federal Reserve Board. Defendant's Exh. RR, at 2.[13]

6. As attorney for the Middendorf group, Metzger prepared all legal documents pertaining to the proposed acquisition. Tr. Vol. I, at 11–13. He suggested that Middendorf obtain proxies from major shareholders and the new investors, drafted a proposed proxy form, contacted new and existing shareholders, and had the proxies signed. Tr. Vol. I, at 13, 153–56; Tr. Vol. III, at 114.[14] Metzger prepared and filed with the SEC a Schedule 13D relating to Middendorf's acquisition of control of FG. Tr. Vol. I, at 14–15; Defendant's Exh. XX. He also appeared with certain of the new investors called to testify at Federal Reserve Board hearings on the IB stock purchase. Tr. Vol. I, at 104–06.

9. On May 23, 1977, FG had two classes of voting stock. There were authorized, issued, and outstanding 5,393,996 shares of Common Stock (entitled to ten votes each), and 492,993 shares of Class A Common Stock, Series 1 (entitled to one vote each). Plaintiff's Exh. 1.

10. Metzger did not represent Middendorf personally. Tr. Vol. III, at 112–13; Defendant's Exh. WW, XX.

11. The recommendations came from Hugh L. McColl, Jr. and Jackson Stephens. Tr. Vol. I, at 10, 151; Plaintiff's Exh. 24, at 29.

12. In addition, a wholly owned IB subsidiary, Financial International Corporation (FIC), owned 428,775 shares, a 7.9% interest. Other IB affiliates and subsidiaries owned a 4.5% interest. Defendant's Exh. RR, at 23–24; Plaintiff's Exh. 1, at 3.

13. In 1974, the Federal Reserve Board determined that IB directly and indirectly controlled FG in violation of the 1966 Amendments to the Bank Holding Company Act. IB contested this determination, ultimately without success. On November 25, 1977, the Board issued a final

order requiring IB and FIC to divest direct and indirect ownership and control of all shares of FG stock. The Board also prohibited IB's Chief Executive Officer and Chairman of the Board, George Olmsted, from holding any office in FG. Defendant's Exh. RR, at 1, 25–29.

14. The proxies were intended to increase Middendorf's voting strength and prove to the Federal Reserve Board that FG did not remain under Olmsted's control. Tr. Vol. I, at 13, 153, 155; Tr. Vol. III, at 114. All were given without consideration. Defendant's Exh. RR, Findings of Fact at 36. Metzger states that he advised Middendorf that proxies granted without consideration may be revoked when sold or at the will of the donor. Tr. Vol. III, at 115. Middendorf testified to the Federal Reserve Board that if the purchasers he represented disposed of this stock, the proxies probably would become worthless. Tr. Vol. I, at 104–05. Although Middendorf could not recall being so informed by Metzger, it is probable that he was aware that if the stock for which he held proxies was sold, the proxies might be deemed to be revoked.

7. The stock acquisition took place on April 29, 1977. The Middendorf investors purchased all of IB's 1,204,231 shares of FG common stock owned of record at a purchase price of $12.50 per share. Plaintiff's Exh. 1, at 1.

8. No member of the Middendorf group bought as much as a 5% interest. The major purchasers were:

| Name | Shares | Percentage of Vote |
|------|--------|--------------------|
| Stephens, Inc. (held beneficially for Jackson Stephens) | 268,400 | 4.9% |
| J.G.P., Ltd. (held beneficially for Jorge G. Pereira) | 240,000 | 4.4% |
| Eugene J. Metzger | 87,991 | 1.6% |
| Thomas G. Wyman | 80,000 | 1.5% |
| Armand Hammer | 80,000 | 1.5% |
| Cape & Co. (held beneficially for NCNB Corporation) | 80,000 | 1.5% |

The remaining Middendorf investors held less than 1% interests. Plaintiff's Exh. 1, at 2.[15]

9. Metzger participated in the April 29 acquisition not only as an attorney for the investors but also as the third largest purchaser. He bought 87,991 shares of FG common stock in his own name, 1.6% of the vote. At $12.50 per share, his purchase price was $1,099,887.50.

10. After the acquisition, Middendorf became the controlling shareholder, with the right to vote 41.6% of the common stock. Although he owned only .8% in his own name, he obtained proxies of varying durations from all but one of the purchasers of IB stock (including Metzger) (19.9%) and all of the IB affiliates (12.4%). He also obtained proxies from Eugene Casey, the largest shareholder outside the Middendorf investors (8.6%). Pretrial Stip. ¶ 4; Plaintiff's Exh. 1, at 2–3.

11. The Middendorf investors "took over" Financial General on June 20, 1977. On that date, Middendorf was elected President, Chief Executive Officer, and Chairman of the Board. Tr. Vol. I, at 5, 20. The 21 board members included all of the major new investors or their representatives.[16]

12. Metzger continued to perform legal services for the investors after the April 29th closing. His bill to FG for services rendered in June reflected 159.6 hours on services performed for the investors: filing of Middendorf's Schedule 13D, appearance at Federal Reserve Board hearings, and preparation of proxy material. Defendant's Exh. K.[17]

13. The record does not reflect the total number of hours Metzger spent on behalf of the investors. His final bill charged the group a total of $64,895.58, allocated to each of the investors pro rata. Tr. Vol. I, at 12; Defendant's Exh. A.[18]

14. Metzger's representation of the Middendorf investment group did not terminate until sometime in June of 1977. Although Metzger testified that his representation of them ended on the date of closing, his final bill was not rendered until June 14, 1977. Tr. Vol. III, at 112; Defendant's Exh. A. Middendorf testified that Metzger performed legal services for the investors continuously from the date of closing until the date the investors "took over," June 20, 1977, after which Metzger represented FG.

---

15. Outside of the Middendorf investors, only three shareholders held greater than a 5% interest in FG's common stock: Eugene Casey (8.6%), FIC (7.9%), and B. Francis Saul, II (approximately 7%). Plaintiff's Exh. 1, at 3.

16. The major new investors represented on the FG board included W. W. Johnson (at the request of Jackson Stephens), Jorge G. Pereira, John J. Lyons (at the request of Metzger), Thomas G. Wyman, Armand Hammer, and Thomas N. Roboz (at the request of NCNB Corporation). Plaintiff's Exh. 1, at 3–7; Tr. Vol. I, at 17. Middendorf's other nominees were Joseph S. Farland, William H. G. Fitzgerald, Mason J. O. Klinck, R. Robert Linowes,

George D. O'Neill, and John Safer. The eight "holdovers" included Justin D. Bowersock, Eugene B. Casey, and William J. Schuilling. Plaintiff's Exh. 1, at 4, 6.

17. FG ultimately determined that its interest in these activities justified the company's payment for the services. Defendant's Exh. K.

18. The cost per investor was 5.389 cents per share. Middendorf paid his share out of his personal funds and understood that the other investors did the same. Tr. Vol. I, at 12; Defendant's Exh. A.

Tr. Vol. I, at 12, 21. Middendorf's testimony is supported by the record and is credible.

C. *Representation of Financial General.*

15. Metzger undertook representation of FG sometime in June of 1977. Pretrial Stip. ¶ 58. The precise date cannot be ascertained.[19] However, by June 20, 1977, Metzger had already begun performing legal services for the corporation.

16. The first task performed by Metzger for FG was the preparation of a 53-page legal memorandum entitled "Where Do We Go From Here?" Plaintiff's Exh. 7; Tr. Vol. I, at 163. The memorandum was prepared by Metzger between April 29 and June 20, 1977, and was distributed at the June 20, 1977 directors' meeting. Tr. Vol. III, at 126; Tr. Vol. I, at 22. It analyzed the structure of FG and its subsidiary banks, and recommended the ways in which Metzger thought the structure could be improved. Tr. Vol. I, at 163; Tr. Vol. III, at 123–36. Metzger billed FG for its preparation. Tr. Vol. I, at 164.[20]

17. Starting in June, Metzger undertook three major legal projects for FG: preparation of legal documents for the merger of three of FG's banks in Northern Virginia (Tr. Vol. I, at 22–23); research on the rights and obligations of FG under an existing computer contract FG sought to terminate (Tr. Vol. I, at 39, 165–66, 168; Tr. Vol. III,

at 119); and investigation of the feasibility of a credit life insurance subsidiary. Metzger worked on the Northern Virginia merger through December of 1977, billing FG a total of 513.55 hours on this project. He worked on the credit life insurance subsidiary question through September of 1977, billing FG a total of 232.25 hours. And he worked on the computer contract question through July of 1977, billing FG a total of 117.9 hours. Plaintiff's Exh. 8–15; Defendant's Exh. K.

18. Metzger also worked on two inquiries the SEC made to his firm. In August, the SEC requested information about a rumored division between pro- and anti-Middendorf factions on the FG Board. Plaintiff's Exh. 3. Until Middendorf pulled him off this project, Metzger assumed the responsibility of responding. Defendant's Exh. AAA; Tr. Vol. I, at 48–50; Defendant's Exh. BBB.[21] In November, the SEC requested information about the possible updating of Middendorf's Schedule 13D. Plaintiff's Exh. 51.[22] Although at trial Metzger denied having any continuing responsibility for the 13D at that time (Tr. Vol. III, at 117), he responded to this inquiry as well. Plaintiff's Exh. 51, at 3; Tr. Vol. II, at 77–80. Metzger billed FG for 55.55 hours spent on these two projects in August, September, October, and November of 1977. Plaintiff's Exh. 10–13.

19. No written agreement was entered and Metzger's subsequent bills do not reflect a starting date.

20. Metzger's first bill to FG contains no itemization for this memo. Presumably time spent on its preparation was included in the general category of legal research, for which Metzger billed FG 60.55 hours in June. Plaintiff's Exh. 8.

21. Metzger denied at trial that Middendorf told him to discontinue his efforts. He also denied that they even discussed the SEC inquiry at all. Tr. Vol. III, at 141. His testimony is not credible. When Metzger first informed Middendorf of the inquiry, Metzger stated, "I will handle this request without making any representations, but I thought you should see." Defendant's Exh. AAA, at 2. One week later, however, Metzger wrote to the SEC, "[M]y response is offered as that of a FG investor. I

would recommend that any questions the staff may have concerning a division within the FG Board of Directors be directed to members thereof." Defendant's Exh. BBB. The abrupt change in Metzger's viewpoint is accounted for by Middendorf's testimony that he was angry at Metzger's initial handling of the matter, that he told Metzger not to "take care of it," and sent Beddow instead to talk to the SEC. Tr. Vol. I, at 49–50.

22. Its concern was "whether the Middendorf Schedule 13D should contemplate information relative to a 'group' composed of the twenty-nine persons" who acquired IB stock. The 13D might have also needed updating to reflect "substantially fewer" proxies over FG shares then held by Middendorf than at the time of acquisition. Plaintiff's Exh. 51.

19. Metzger's time on the Northern Virginia merger, the computer contract, the credit life insurance subsidiary, and the SEC inquiries totalled 919.25 hours in the period from June through December of 1977. Metzger did not bill FG for any work on these projects after December. Plaintiff's Exh. 15.

20. In January of 1978, Metzger worked for FG on two matters: collecting and forwarding proxies granted to Middendorf and responding to an auditor's request for information. Plaintiff's Exh. 15; Tr. Vol. III, at 112. This amounted to 2.75 hours, for which Metzger billed FG $214.15. Plaintiff's Exh. 15.

21. For legal services rendered to FG from June, 1977 through January, 1978, Metzger billed the corporation a total of $115,546.07. The breakdown by months is as follows: [23]

| Month Services Rendered | Total Hours | Amount Billed | Date of Bill |
|---|---|---|---|
| 1977 | | | |
| June | 507.35 | $45,793.56 | July 25, 1977 |
| July | 330.85 | 28,460.21 | Aug. 5, 1977 |
| August | 226.30 | 20,698.49 | Sept. 16, 1977 |
| September | 64.6 | 5,331.86 | Oct. 14, 1977 |
| October | 50.3 | 4,176.55 | Nov. 10, 1977 |
| November | 54.3 | 4,638.75 | Dec. 16, 1977 |
| December | 82.85 | 6,232.50 | Jan. 25, 1978 |
| 1978 | | | |
| January | 2.75 | 214.15 | Feb. 23, 1978 |
| | 1,319.30 | $115,546.07 | |

Plaintiff's Exh. 8–15.

22. Until September, Metzger had virtually a free hand in determining the amount of work to be done on particular projects. Middendorf had no formal method of assigning or defining the scope of work, and Metzger submitted no prior estimates of expenditures. This "expansionist" method of operating resulted in bills from Metzger for hours beyond those expected by Middendorf. Tr. Vol. I, at 127–29; Defendant's Exh. K.[24]

23. In September, Middendorf and Jack Beddow, the corporate officer responsible for reviewing and approving bills submitted by FG's attorneys, became concerned over the size of Metzger's charges. Rather than approving them for payment, Beddow recommended that the bills be sent to the Audit Committee for approval. Tr. Vol. II, at 74–75. No payment was made by FG on them or on subsequent bills while the Audit Committee conducted its review. Tr. Vol. II, at 84.

24. The concern over Metzger's bills resulted in a formal statement by FG of its attorney-client relation with Metzger. On September 8, 1977, Middendorf sent Metzger a memorandum directing him not to undertake any future assignments unless they were given in writing by Middendorf. Middendorf disclaimed any responsibility on the part of FG for payment for services not performed in accordance with such instructions. He also reserved authority to cancel by written notice further work by Metzger on existing projects. Defendant's Exh. B.[25]

25. In subsequent memos, the last dated October 3, 1977, Metzger's authority to perform legal services for FG was restricted to the Northern Virginia merger, a tender offer for additional stock in the Northern Virginia banks, and any other work for

---

23. The total billings include time spent on two other July projects: work on reciprocal bank agreements that would allow certain customers transactions to be carried out at any of the FG banks (8 hours), and work on proposed by-law changes (32.8). Plaintiff's Exh. 9.

24. It is nevertheless clear that from the inception of Metzger's FG representation, Middendorf was the sole company official who authorized and directed his legal services. Pretrial Stip. ¶ 59; Defendant's Exh. C, K; Tr. Vol. I, at 23, 127, 167–68.

25. The memorandum stated in part:

It is the purpose of this memorandum to define the basis on which [FG] will expect in the future to avail [itself] of your legal services . . . .

. . . .

3. As Chief Executive Officer of [FG], I shall personally give you in writing any assignment which we wish you . . . to undertake. . . .

. . . .

5. On behalf of [FG], I retain full authority to cancel further work on any matter now or hereafter assigned to you . . . by giving written notice of such cancellation.
Defendant's Exh. B.

which Metzger received specific written instructions. Defendant's Exh. C–H.[26]

26. Metzger asserts that as a result of these directives he performed no significant legal services for FG after September of 1977. His assertion is not supported by the record. After September, he billed FG over $15,000 for 190 hours of work. Moreover, the Northern Virginia merger was not, as characterized by Metzger, a "modest assignment." Tr. Vol. III, at 102–03.[27] It was the primary task on which Metzger worked for FG, accounting for over a third of the total hours billed to FG during his representation. After September, Metzger billed 196.2 of those hours, approximately forty percent of the total time the project absorbed. Plaintiff's Exh. 11–14.[28]

27. In December of 1977, the Audit Committee reached an agreement with Metzger to pay $20,000 less than he had billed FG for the first four months of his representation. Pretrial Stip. ¶ 59; Defendant's Exh. I–M. Accordingly, on December 20, 1977, FG paid Metzger $80,284.12 for services rendered from June through September of 1977. Plaintiff's Exh. 16; Pretrial Stip. ¶ 59.

28. FG did not pay Metzger for services performed in the months of October, 1977 through January, 1978. Those bills, totalling $15,261.95, remain unpaid. Tr. Vol. II, at 84; Plaintiff's Exh. 17.

29. Metzger's representation of FG was effectively terminated on February 1, 1978. Before that date, FG considered him to be one of its lawyers. Tr. Vol. II, at 90. Metzger had performed legal services for FG in January of 1978 and billed his hours to the corporation. Plaintiff's Exh. 15. On February 1, 1978, Beddow and other officials of FG visited Metzger in his law offices to inquire into activities suspected to be in conflict with FG's interests. Tr. Vol. II, at 84–87. The meeting ended when Metzger threw Beddow and the others out of his office; Beddow's last words were, "You are going to have a hell of a time getting any money out of our company after this." Tr. Vol. II, at 90; Plaintiff's Exh. 17. After February 1, 1978, Metzger performed no legal services for FG. The Court accordingly discredits Metzger's testimony that his representation of FG halted at the end of December, 1977 (Tr. Vol. III, at 112, 148), and finds that it continued through the end of January, 1978.

---

26. On September 8, 1977, Metzger responded to Middendorf's first directive with a memo listing four matters on which he was then working. He concluded, "Absent advice to the contrary, I will assume that these instructions stand." Defendant's Exh. C. Middendorf then ordered Metzger to suspend work on the credit life insurance subsidiary project. Defendant's Exh. D, E. On September 29, 1977, Middendorf sent another memo, stating:

> At a meeting of the Executive Committee of the Board of Directors . . . I reviewed with them the bills that your firm has submitted . . . and the various memos that we have exchanged concerning work assignments . . . . [T]he Committee asked me to send another memo summarizing the situation today . . . .
> Accordingly, please discontinue all further legal work on all projects on which you may have been working. Do not undertake any new work on any project unless and until you receive specific written instruction to do so.

Defendant's Exh. F. The next day Middendorf gave Metzger written authorization to provide legal services in connection with the proposed Northern Virginia merger. Defendant's Exh. G (Sept. 30, 1977). On October 3, 1977, Beddow requested a member of Metzger's firm, Ralph Long, to assist in developing a tender offer for additional stock in FG's three Northern Virginia banks. Defendant's Exh. H.

27. It also was not, as Metzger contends, outside his "field of specialty." Tr. Vol. III, at 102; Tr. Vol. I, at 177. Indeed, Metzger characterized himself as a specialist "in representing commercial banks, and bank holding companies . . . before the various state and Federal bank regulatory agencies," specifically citing mergers as one of those areas of his expertise. Tr. Vol. III, at 85. Metzger's attempt at trial to disassociate himself from the Northern Virginia merger work also contradicts his testimony that he "attended hundreds of meetings with Mr. Middendorf, with people on my staff" on matters involving FG projects, including "the structural questions associated with the reorganization of the company." Tr. Vol. I, at 167–69.

28. In fact, Metzger testified that the merger project did not become "a matter of some currency" until the fall of 1977. Tr. Vol. I, at 177–78.

### D. *Participation in Watergate Group.*

30. Metzger early became dissatisfied with Middendorf's business management. The source of his dissatisfaction was Middendorf's failure to act on certain business proposals made by Metzger in the "Where Do We Go From Here?" memorandum presented at the June 20, 1977 Board meeting. Tr. Vol. I, at 178–81.[29]

31. Metzger also became dissatisfied with Middendorf's decisions concerning the scope of Metzger's legal employment. Metzger desired to be FG's general counsel, a suggestion rebuffed by Middendorf.[30] The friction increased with the September reduction in Metzger's work authorizations and suspension of payment of his bills. Tr. Vol. III, at 102, 116, 157; Tr. Vol. I, at 70, 126, 129–30, 178–79.

32. Metzger's dissatisfaction found company in a group of dissident FG Board members. These members were unhappy with Middendorf's failure to name a Chief Operating Officer with prior extensive banking experience. They also desired a greater break with IB. Tr. Vol. I, at 159–60, 171, 181–82; Tr. Vol. III, at 53–54.[31]

33. The group included most of the major new shareholders of FG: Stephens (and his representative W. W. Johnson), Pereira, Metzger, Wyman, McColl, and Armand Hammer. Tr. Vol. I, at 156–58; Plaintiff's Exh. 23, at 38–39; Defendant's Exh. CCC.[32] Collectively this group owned 15.4% of FG's voting stock. Plaintiff's Exh. 1, at 2.

34. The group held its first meeting on June 30, 1977 at the Watergate Hotel. Pretrial Stip. ¶ 28; Tr. Vol. I, at 156; Defendant's Exh. CCC. Middendorf did not attend the meeting. Tr. Vol. I, at 161. He had not been invited by Metzger or any other person and had not been informed that the meeting was going to take place. Tr. Vol. I, at 42, 161; Plaintiff's Exh. 23, at 52. Metzger did. Tr. Vol. III, at 166. The group reached three primary agreements. It selected Thomas Wyman to represent the group in discussions with Middendorf. Defendant's Exh. CCC. It agreed that a qualified banker should immediately be brought in as Chief Operating Officer. Tr. Vol. I, at 172; Tr. Vol. III, at 54; Defendant's Exh. CCC.[33] And the group agreed that FG's general counsel should be dismissed in order to sever all ties with IB. Plaintiff's Exh. 23, at 26; Plaintiff's Exh. 54, at 11.[34]

---

**29.** *See* Plaintiff's Exh. 7. In Metzger's view, FG was "the last of the do-dos" for failing, among other things, to centralize control of, and eliminate minority interests in, FG's subsidiary banks. Tr. Vol. III, at 123–30. Middendorf believed that adoption of the proposals "would have been a very serious mistake." Tr. Vol. I, at 34–37.

**30.** Middendorf testified that after "about a month on the job" Metzger requested to be designated general counsel for the company and certain of its subsidiary banks. Tr. Vol. I, at 30–33. Although Metzger performed most of FG's legal work until September, he was never general counsel. Tr. Vol. I, at 30, 125–26, 130.

**31.** Middendorf had proposed Colonel Charles Daniel for the position of Chief Operating Officer at the June 20, 1977 Board meeting. Daniel was opposed by some other Board members, so Middendorf withdrew the nomination. Tr. Vol. I, at 27–28; Tr. Vol. III, at 65–66.

**32.** Hammer could not attend the first Watergate meeting but was "in accord" with the group's position. Tr. Vol. III, at 68. Metzger recalled that he attended the subsequent meetings. Tr. Vol. I, at 157. Joseph S. Farland was also a member of the group until he sold his shares in late July. Tr. Vol. III, at 52, 61–62; Defendant's Exh. BB, CC.

**33.** Metzger believed that the group wanted to reduce Middendorf's role to that of "a front man," putting responsibility for operation into "professional management." Tr. Vol. I, at 161. Farland testified to the same effect. Tr. Vol. III, at 69–70.

**34.** Before the Middendorf investors acquired IB's stock in Financial General, the law firm of Martin, Whitfield, Thaler & Bebchick had been FG's general counsel. Tr. Vol. I, at 130–31. It was also general counsel to IB. Tr. Vol. I, at 33–34; Pretrial Stip. ¶ 64. The Martin firm continued to perform legal work for FG during 1977 and 1978, but not as FG's general counsel. Pretrial Stip. ¶ 64; Tr. Vol. I, at 126; Plaintiff's Exh. 23, at 24, 84–85. Wyman several times discussed with Middendorf the possibility that Metzger could assume some of the legal duties of general counsel. Wyman discussed the subject with Johnson and Pereira as well, both of whom agreed. Plaintiff's Exh. 23, at 84–89.

35. After the first meeting, Wyman and several others visited Middendorf to discuss their concerns. Plaintiff's Exh. 23, at 83–90; Tr. Vol. I, at 44. Metzger did not attend this discussion. Tr. Vol. I, at 45.

36. The second meeting of the Watergate group took place in July, a few days before an upcoming July 17 Board meeting. Pretrial Stip. ¶ 30. Middendorf was not invited and was not in attendance. Plaintiff's Exh. 23, at 61. Metzger was.[35] The dissident Board members expressed the same concerns as previously, but resolved to recommend two specific changes in FG management. The group recommended that Bud Manderfield, president of one of FG's subsidiary banks, be named as Chief Operating Officer. It also recommended that Wyman replace the existing Vice-Chairman of the Board, and that the by-laws be amended to make the position that of an officer with a salary. Pretrial Stip. ¶ 30; Tr. Vol. I, at 171–72; 174–75; Plaintiff's Exh. 23, at 60–61, 96–97, 111.

37. A few days after the second meeting, Wyman and other members of the group again visited Middendorf. Plaintiff's Exh. 23, at 112–15; Pretrial Stip. ¶ 31. Middendorf concurred with their suggestions, calling in Metzger to draft appropriate by-law changes. Pretrial Stip. ¶ 32; Plaintiff's Exh. 23, at 111–12, 114; Tr. Vol. III, at 59. But sometime before the July 17, 1977 Board meeting, the proposed appointments and by-law changes were taken off the agenda. The Watergate group's suggestions were therefore not considered by the FG Board. Plaintiff's Exh. 23, at 121–25; Tr. Vol. I, at 46–48.

38. By August of 1977, rumors of the division on the FG Board had reached the SEC. The SEC wrote Metzger for information. Plaintiff's Exh. 3.[36] Metzger responded in his legal capacity, informing Middendorf of the inquiry and noting, "I will handle this request . . . ." Defendant's Exh. AAA.

39. The third and final meeting of the group occurred in December of 1977, again at the Watergate. Metzger again was present and Middendorf was not. Plaintiff's Exh. 19, at 19–20, 51, 142. The group was still concerned that its suggestion respecting a Chief Operating Officer had not been accepted. Plaintiff's Exh. 19, at 145–46. There is no indication in the record that this meeting was ever subsequently brought to the attention of Middendorf.[37]

40. Metzger at no time disclosed to Middendorf his plans to attend or his participation in any of the three Watergate group meetings. Tr. Vol. I, at 43. Even after the SEC inquiry, Metzger did not inform Middendorf of his participation in the dissident faction.

E. *Solicitation of Foreign FG Purchaser.*

41. In October of 1977 Metzger devised a plan to sell FG to a European bank. He outlined the plan in a letter to Hugh L. McColl, Jr., President of North Carolina National Bank Corporation (NCNB Corp.), a major FG shareholder and Metzger's

**35.** Metzger's trial testimony to the contrary is not credible (Tr. Vol. III, at 132). At depositions two years earlier, Metzger conceded that he had been present at the second meeting. Plaintiff's Exh. 19, at 19–20, 50–53.

**36.** The August 12, 1977 letter stated in part, We have learned that the FGB board of directors is sharply divided between pro- and anti-Middendorf factions. The staff wants to know the basis for the division (e. g., is there a disagreement over the direction in which FGB should go, or is there some concern that Middendorf is incapable of fulfilling his responsibilities as chief executive officer) and whether a proxy fight is anticipated.
Plaintiff's Exh. 3. Metzger asserted at trial that the inquiry was made to him in his personal capacity as an FG shareholder. Tr. Vol. III, at 139–40. This testimony is not credible. Metzger was the attorney who had filed Middendorf's Schedule 13D, represented the investors, and then represented FG. Any dissension that might threaten Middendorf's control would be a matter to be taken up by Metzger in this legal capacity. The letter so contemplated—seeking information, not an opinion—and was so treated by Metzger's firm. *See* Defendant's Exh. AAA.

**37.** The leaders of the dissident group, Wyman and Pereira, sold their FG stock in January, 1978 (Pretrial Stip. ¶¶ 46–48), effectively dissolving the Watergate group.

client for ten years. Plaintiff's Exh. 4; Tr. Vol. III, at 175. Metzger intended McColl to show the letter to potential purchasers during McColl's planned visit of NCNB Corp.'s corresponding banks in Europe. Tr. Vol. III, at 135, 175.[38]

42. Metzger's letter, dated October 14, 1977, was entitled *"Re: Sale of Financial General."* In it he proposed offering the stock of FG's eight largest shareholders at a price of $25 per share to a European bank. With the approximately 30% interest acquired, the purchaser could make a tender offer at $14 per share, bringing in an estimated 40% more of FG's common stock. At that point the new purchaser could "go private" under state law, freezing out the remaining one-third of FG's shareholders. The total cost to the purchaser would be $103 million. Plaintiff's Exh. 4.[39]

43. Metzger included himself among the major shareholders listed. At the proposed sales price of $25 per share, Metzger stood to net $1,099,887.50 if his plan was adopted.

44. Metzger concluded his letter by offering his legal services and his knowledge

of Financial General matters to any bank interested in acquiring FG. Tr. Vol. III, at 188, 197. The final paragraph stated:

I am generally familiar with the structure of F.G. and the legal problems which might interest a potential purchaser— have gun, will travel.

Plaintiff's Exh. 4.

45. Aside from the potential acquiring bank, Metzger purported to represent three entities with substantial financial stakes in his plan: himself, as a FG shareholder; NCNB Corp.; and Financial General. Tr. Vol. III, at 175, 191.

46. Metzger was not authorized by Middendorf or any other FG official to sell FG. He at no time sent a copy of the October 14 letter to Middendorf. Nor did he ever disclose the fact that he had proposed such a scheme. Tr. Vol. III, at 172–74.

47. Metzger asserted at trial that he did not give copies of the letter to anyone other than McColl and that his plan did not result in any legal employment. Tr. Vol. III, at 138, 174, 221–22. The record does not sup-

---

**38.** Metzger testified at trial that the letter resulted from McColl's request to "put in writing" a discussion they had had about selling NCNB Corp.'s stock in FG. Tr. Vol. III, at 135, 174. Upon receipt of the October 14 letter, however, McColl disclaimed any involvement in Metzger's scheme. McColl wrote Metzger on November 4, 1977, stating in part,

As with any other investment, we will be happy to listen to any reasonable offer by a prospective purchaser but we must retain the right to exercise our independent judgment in considering that offer .... In that connection, neither you nor anyone else is authorized to speak for us nor to include our shares in a package of shares to be made available on an all or none basis.

Plaintiff's Exh. 5. Metzger then responded, "I have your letter of November 4, 1977. Intentionally, I am sure, it was the coldest thing I have encountered since being required to sleep outdoors one night a month when stationed in Alaska." Defendant's Exh. TT. The Court concludes that McColl did not, on behalf of NCNB Corp., authorize Metzger to develop a plan to sell FG.

**39.** Metzger asserted at trial that the letter did not set forth a "plan" but merely stated "one of the ways in which one could legally bring to pass a change in the ownership of the institution." Tr. Vol. III, at 173. His assertion is

rebutted by the detail contained in the letter. For example, Metzger named the major shareholders and the size of their holdings, discussed prices for the proposed transactions, and set forth a time frame for the various steps. The third paragraph illustrates:

Assume that we offer this stock to our buyer at $25 per share—cost $44.2 million. Jack Stephens is of the opinion that a tender at $14 would bring in 40% or 2,355,000 shares—$33 million; leaving 1,765,691 shares in public hands. Under Virginia law, 100% could then be obtained by simply "going private" with a 66⅔ vote (already in hand). Since the law provides for appraisal rights, let's assume costs rose to $15 per share—$26 million. For $103 million, the purchasers would acquire $96 million in book value—less than 1.1 book gives entry to 4 U.S. states. (New York, Maryland; D.C., and Virginia—Tennessee must always remain a minority position).

Metzger also spoke with certainty about discussing the plan with NCNB Corp.'s corresponding banks:

Jack Stephens will raise the subject with a Japanese client, but I believe that a European bank could benefit more from this opportunity.

Plaintiff's Exh. 4.

port his contention. Although McColl immediately disclaimed any involvement of NCNB Corp. in Metzger's scheme, it is highly probable that McColl discussed the letter with Stephens.[40] Stephens was also aware of Metzger's scheme to sell FG and desire to represent any prospective purchaser through his own discussions with Metzger.[41] Approximately one month later, in November of 1977, Stephens recommended Metzger's legal services to a European bank interested in acquiring FG stock. Pretrial Stip. ¶ 36; Plaintiff's Exh. 20, at 119; Tr. Vol. I, at 297–98. The bank hired Metzger, who over the next few months arranged for the purchase or attempted purchase of the shares of seven of the eight major shareholders listed in Metzger's October 14 letter. Pretrial Stip. ¶¶ 45 (Stephens, Metzger, NCNB Corp.), 48 (Wyman, Pereira), 41 (Saul), 42 (Casey). Metzger's plan was thus successful to the extent that a European bank hired him to represent it in the attempted purchase of a controlling share of FG's common stock.

### F. Representation of Middle Eastern Investors.

48. On November 30, 1977, at a meeting at the Hilton Hotel in Washington, D.C., Metzger was retained by Agha Hasan Abedi, the president of BCCI, to represent BCCI clients in the purchase of FG stock. Plaintiff's Exh. 22, at 54; Tr. Vol. I, at 185–86, 298. BCCI was in the practice of giving its clients advice on investment opportunities in the United States. Tr. Vol. I, at 276–77; Plaintiff's Exh. 21, at 10–11. Abedi had become interested in FG as one such opportunity in early November, through his contact with Stephens on another matter.[42]

49. Abedi instructed Metzger to find available blocks of FG stock, determine the price, and report the information back to Abedi. Abedi would then decide whether or not to authorize a purchase for a particular client. Tr. Vol. I, at 200; Tr. Vol. III, at 91–92; Pretrial Stip. ¶ 13.[43] Metzger understood that the names of the principals— the BCCI clients—were not to be revealed. Tr. Vol. III, at 90.

50. Under these instructions, Metzger began to solicit sales of FG stock from its major shareholders. Metzger first attempted to purchase a block of FIC stock. Tr. Vol. I, at 187–88; Plaintiff's Exh. 22, at 55.[44] At an FIC Board meeting on November 30 or December 1, 1977, Metzger offered to buy approximately 115,000 shares

**40.** See note 38, supra. Stephens testified at his deposition that he and McColl were good friends and that it was natural for them to talk about matters regarding Financial General. Plaintiff's Exh. 24, at 15, 80. Both men purchased stock as part of the Middendorf group; in fact, Stephens had brought in McColl to the Middendorf group. Plaintiff's Exh. 24, at 14. Both men had recommended Metzger to represent the new investors, and all three had participated in the dissident Watergate group.

**41.** Metzger's letter mentioned Stephens twice, suggesting that Stephens had not only discussed the details of the proposed transactions but also had promised to introduce the plan to a foreign client. Plaintiff's Exh. 4. Metzger admitted on cross-examination that he had, in fact, talked to Stephens by phone about selling FG. Tr. Vol. III, at 186.

**42.** In early November an officer of BCCI, Abdul Sami, met with Stephens in Little Rock, Arkansas regarding a possible investment by one of BCCI's clients in National Bank of Georgia (NBG). Sami had been referred to Stephens by Bert Lance, from whom Sami was also considering purchasing NBG stock. Stephens mentioned FG as a possible investment and supplied Sami with public financial information. After BCCI studied the material, the bank concluded that FG was a good investment to recommend to some of its clients. Pretrial Stip. ¶¶ 34–35; Tr. Vol. I, at 277–81, 284–85; Plaintiff's Exh. 21, at 20–22. Later in the month Abedi came to the United States for transactions regarding NBG. When Abedi expressed interest in FG, Stephens referred him to Metzger. Pretrial Stip. ¶ 36; Plaintiff's Exh. 21, at 29–30, 34.

**43.** These instructions were given to Metzger on December 1, 1977. That day Abedi met Metzger briefly at the Hilton Hotel, during a meeting primarily concerned with NBG. Tr. Vol. I, at 296–97; Tr. Vol. II, at 5–7.

**44.** On November 25, 1977, the Federal Reserve Board had ordered FIC to divest itself within 90 days of FG stock. Pretrial Stip. ¶ 33; Defendant's Exh. RR, at 25. FIC attempted to expedite the sale. Tr. Vol. I, at 187–88.

of FIC's Financial General stock (approximately 2.2% of vote) at $12.50 per share, on behalf of an undisclosed principal. Tr. Vol. I, at 191–200; Pretrial Stip. ¶¶ 16–17.[45] When Metzger refused to disclose the name of his principal, FIC rejected his offer. Tr. Vol. I, at 197–99.

51. Metzger next approached B. F. Saul, II, holder of the third largest block of FG stock (approximately 7.0% of vote). On about December 3, 1977, Metzger offered to buy for cash all of his stock at $12.50 per share. Tr. Vol. I, at 199–200; Pretrial Stip. ¶ 41; Plaintiff's Exh. 55, at 41–46. Metzger again refused to disclose the name of his principal, although it was requested by Saul. Tr. Vol. I, at 201; Plaintiff's Exh. 55, at 46. Saul later decided not to sell his FG stock. Plaintiff's Exh. 55, at 51–53.

52. About the same time he approached Saul, Metzger solicited the stock of Eugene Casey, FG's largest shareholder with 8.6% of the vote. In early December, Metzger requested one of his clients, Dr. Sachs, to speak with Casey. Dr. Sachs offered to buy all of Casey's stock at $12.50 per share, on behalf of "a Washington law firm who was representing an undisclosed principal." Casey was not then interested in selling. Pretrial Stip. ¶ 42; Tr. Vol. I, at 201–04.[46]

53. In mid-December of 1977, Metzger directed members of his firm to contact other large FG shareholders. Two or three were contacted, but none were interested in selling their stock. Tr. Vol. I, at 204–05; Plaintiff's Exh. 18.

54. Thus, by mid-December, Metzger had solicited over 17.8% of FG's stock. When none of the solicitations resulted in sales, BCCI, through Abdul Sami, authorized Metzger to start purchases on the open market. Tr. Vol. II, at 10.

55. The open market purchasing program involved primarily Sami, George H. Davis, who was an officer of Stephens, Inc., and Metzger. Davis was authorized to buy FG stock in maximum amounts of 10,000 shares per day, to keep the market price of the stock from sharply increasing. Davis was also instructed to keep Sami and Metzger informed of the purchases. Tr. Vol. II, at 8–11; Pretrial Stip. ¶¶ 18–20. The stock was charged to and placed in an account at Stephens, Inc. opened by Metzger. The account was in Metzger's name—"Eugene J. Metzger, Agent"—to shield the identity of the BCCI principals. Tr. Vol. I, at 210–12; Plaintiff's Exh. 31, 32. Each purchase was noticed to Metzger by a ticket. Tr. Vol. I, at 212. Sami monitored the entire operation. He authorized purchases only when he had a BCCI client willing to pay for the shares. Tr. Vol. I, at 240. Then he kept "a careful finger on how much was bought and at what price." Tr. Vol. I, at 215–16; Tr. Vol. II, at 11, 173–74; Plaintiff's Exh. 43–47; Pretrial Stip. ¶ 22.

56. Open market purchases began on December 20, 1977. By December 30, 25,700 shares of FG stock had been purchased for Metzger's account. In January an additional 212,500 shares were acquired. By January 27, the date on which the last open market purchases were made, 238,200 shares—approximately 4% of FG's stock—had been acquired on the open market on behalf of Metzger's BCCI principals. Plaintiff's Exh. 6; Pretrial Stip. ¶¶ 43, 54.

57. Metzger supplemented the open market purchases with a series of private transactions. On January 6, 1978, NCNB Corp. sold its 83,200 shares to Metzger at $12.50 per share. Tr. Vol. I, at 219; Plaintiff's Exh. 6; Pretrial Stip. ¶ 45. On the same date Metzger sold 35,000 of his own shares at $12.50 per share while Stephens,

45. Present at the meeting was Justin Bowersock, a board member of FIC and a pre-Middendorf holdover on the FG board. Tr. Vol. I, at 196; Plaintiff's Exh. 1. Guy Martin was also there, as counsel for FIC. Tr. Vol. I, at 196; Pretrial Stip. ¶ 15. Metzger had initially contacted Martin to offer a bid on the FIC shares. Pretrial Stip. ¶ 15.

46. Metzger made a second contact with Casey in January. On January 23, 1978 Metzger had lunch with Casey at the Joshua Tree Restaurant in Washington, D.C., on Casey's request to discuss the sale of his stock. Plaintiff's Exh. 19, at 212–13. By early February, Casey had still not decided whether to sell. Plaintiff's Exh. 20, at 147.

Inc. sold 70,000 of its shares at $12.63 per share. Tr. Vol. I, at 208; Plaintiff's Exh. 6; Pretrial Stip. ¶ 45. On January 6 and 31 Wyman sold 113,760 FG shares owned by him and his brother at $13.00 per share. Tr. Vol. I, at 219–20; Plaintiff's Exh. 6.[47] On January 6 and 24 General Olmsted sold 263,480 shares at $15.00 per share. Tr. Vol. I, at 221–22; Plaintiff's Exh. 6.[48] On January 31, Peter Flanigan, who had invested in FG with Middendorf, sold 16,640 shares at $13.00 per share. Tr. Vol. I, at 220; Plaintiff's Exh. 6. And on January 31, Pereira sold his entire interest of 249,600 shares, also at $13.00 per share. Tr. Vol. I, at 221; Plaintiff's Exh. 6. These January transactions accumulated for Metzger's BCCI clients 838,390 shares of FG stock, approximately 15% of the common stock outstanding.[49]

58. In December of 1977 and January of 1978, through open market and private transactions, Metzger acquired a total of 1,076,590 shares of FG stock for his BCCI clients, nearly 20% of the vote. Plaintiff's Exh. 6.[50]

59. The stock ultimately went to the accounts of four BCCI clients. Initially, the stock was bought for Sheikh Kamal Adham. Tr. Vol. I, at 185. By January 6, 1978, nearly 5% of FG's stock had been accumulated for his account. Metzger believed that if his shares reached 5%, a Schedule 13D disclosure statement would have to be filed, revealing Adham's identity. Sami accordingly "developed" a second purchaser. Tr. Vol. I, at 227, 241; Tr. Vol. III, at 104–05.

60. The second purchaser was Faisal Saud Al-Fulaij. Tr. Vol. I, at 228; Pretrial Stip. ¶ 23. Until his ownership approached 5%, purchases of FG stock were made for his account.[51] A third purchaser was then brought in, Sheikh Sultan Bin Zaid Al-Nahyan (Sultan), the Crown Prince of Abu Dhabi. Tr. Vol. I, at 229. Metzger purchased nearly 5% of FG shares for his account.[52] The fourth purchaser was the Sultan's brother, Sheikh Mohammed, a minor who purchased through Abdullah Darwaish. Tr. Vol. I, at 229–30. Nearly 5% of FG shares were purchased for him.[53]

61. Metzger testified at trial that the only purchaser of whom he was aware in December was Adham. Tr. Vol. III, at 99–100. This statement is misleading. Metzger was well aware from the outset of his retention by Abedi that he was being asked to represent more than one purchaser. Metzger testified that he was excited at the prospect of bring to FG "a substantial additional pool of investors." Tr. Vol. III, at 88. He also testified that when he asked Abedi whether Adham would be the only investor, Abedi replied, "No. . . . If this stock is available I might prefer to put two or three of my investors, if they were available, into this investment." Tr. Vol. III, at 89, 92.

47. Wyman requested the name of Metzger's principal. Metzger did not reveal it. Pretrial Stip. ¶ 46.

48. Olmsted sold shares of stock that he owned or through affiliates controlled. Plaintiff's Exh. 29, 36; Plaintiff's Exh. 1. Although one of the transactions did not close until February, the agreement to acquire the shares was entered in January. Pretrial Stip. ¶ 55; Tr. Vol. II, at 180.

49. The total includes 5,000 shares sold to Metzger as agent in December by William Cobb, former President and Chief Executive Officer of FG. Tr. Vol. I, at 221; Plaintiff's Exh. 6; Pretrial Stip. ¶ 68; Defendant's Exh. GGG, at 5, 7, 59–60.

50. Payment for the open market and private purchases was made out of $1,350,000 wired to Metzger to pay for the FIC stock. Tr. Vol. III, at 100–101. Metzger drew checks payable to Stephens, Inc. until the fund ran out. Then Davis used money out of a Stephens, Inc. account at NBG to pay for the shares. The NBG account was replenished from time to time by BCCI clients. Tr. Vol. I, at 222–25. For the Olmsted transactions, Stephens, Inc. transferred funds to Metzger's account at Virginia National Bank. Metzger then drew checks on his account payable to the person designated by Olmsted. Tr. Vol. I, at 226–27.

51. The Wyman shares went to Al-Fulaij. Pretrial Stip. ¶ 49.

52. The Olmsted shares went to the Sultan. Tr. Vol. I, at 229; Pretrial Stip. ¶ 50.

53. Mohammed received the Pereira and Flanigan shares. Pretrial Stip. ¶ 49; Tr. Vol. I, at 229.

62. When each subsequent purchaser was brought in, Metzger knew their identities. He knew that the first investor was Adham. Tr. Vol. III, at 96–97. He knew that the second investor for whom he purchased Wyman's stock on January 6 was Al-Fulaij. Pretrial Stip. ¶ 44; Tr. Vol. I, at 241; Tr. Vol. III, at 104. Metzger knew the Sultan's identity when he closed the agreement to purchase Olmsted's shares on January 24. Tr. Vol. I, at 229. And at a minimum he knew that Sami had lined up a fourth principal for whom Metzger purchased Pereira's and Flanigan's shares at the end of January. Tr. Vol. I, at 236–40.

63. Metzger was also well aware that the foreign clients of BCCI, purchasing FG shares on Abedi's advice and through Metzger as agent, were likely to be perceived as a control group for the purposes of filing disclosure statements. Metzger testified that he so advised Abedi on November 30, 1977. Tr. Vol. III, at 90–91. In early January, Metzger advised Sami to the same effect. Tr. Vol. I, at 227, 241; Tr. Vol. III, at 106. In January, Metzger obtained powers of attorney from the Middle Eastern investors, so that he could file the requisite 13D statements. Tr. Vol. III, at 107, 109. Sometime the same month he hired a Virginia law firm to discuss with him and with Sami their responsibilities under the Virginia Take-Over-Bid Disclosure statute and to reinforce Metzger's advice on filing the 13D's. Tr. Vol. III, at 80–81, 107.[54]

64. Metzger testified at trial that he did not view his BCCI principals as constituting a "group", but advised filing disclosure statements only as "an act of prudence." Tr. Vol. III, at 214–15. Metzger further testified that he never had "any . . . intimation" that Abedi's investors would act in concert with regard to FG's stock. Tr. Vol. III, at 106. These assertions are not supported by the record. Metzger was informed by Abedi at the outset of the representation that the investors might seek a seat on FG's Board of Directors. Tr. Vol. III, at 89. In February, when the Middle Eastern investors had acquired nearly 20% of FG's shares, Metzger sent Pereira a telex soliciting his presence on the Board and asking him to meet to discuss the subject. Plaintiff's Exh. 33, 34. At about the same time, Metzger discussed with Sami the fact that certain of the shares acquired by BCCI were subject to proxies held by Middendorf. Metzger advised Sami that with regard to the Olmsted shares, when the shares were transferred, the proxies were extinguished. Plaintiff's Exh. 22, at 158–60. Sami understood that the four Middle Eastern investors who then held the shares had the power to vote them. Plaintiff's Exh. 22, at 160.

65. Metzger testified at trial that he "did everything but stand on the walls" to disclose his representation of BCCI to FG. Tr. Vol. III, at 93. The record reveals no such effort. Metzger's only disclosure to FG was indirect and incidental to his attempt to purchase stock. Metzger asserted at trial that he "announced" his representation through Guy Martin—attorney both for FIC and FG—and Justin Bowersock, a director of both corporations. Tr. Vol. III, at 93–96; see note 45 supra. Neither of these men were officers of FG. Neither were asked by Metzger to relay their information to Middendorf or another officer. And to neither did Metzger disclose any information beyond the fact that he was authorized to purchase FIC's stock for an undisclosed principal. This information was not intended to be a disclosure to FG of Metzger's representation,[55] and omitted critical details about the BCCI representation.[56]

---

54. The meeting with the Virginia attorney took place in Metzger's office on February 6, 1978. Tr. Vol. III, at 77–78.

55. In Metzger's words, "I told Mr. Martin and I told all of the people I discussed the issue with, precisely what I was interested in doing, buying stock. I withheld the name of my principals.

That was my instruction. I followed those instructions." Tr. Vol. III, at 157.

56. For example, Metzger withheld from Martin and Bowersock and all other shareholders whose stock he solicited or purchased, the names of his principals, the fact that there was more than one, or that his principals might

66. The record reveals a pattern of deliberate nondisclosure to Middendorf of all aspects of Metzger's representation of BCCI. He did not seek Middendorf's consent before accepting Abedi's offer of retention on November 30, 1977. Tr. Vol. III, at 86–88.[57] He did not subsequently inform Middendorf that he had entered an agreement with BCCI to represent Adham. Tr. Vol. I, at 65–66. When Metzger's representation expanded to include second, third, and fourth purchasers, he did not tell Middendorf. Tr. Vol. I, at 65–66; Tr. Vol. III, at 96. Metzger did not inform Middendorf of his attempt to purchase FIC stock (Tr. Vol. I, at 64), his attempts to make other private purchases of FG stock (Tr. Vol. I, at 64), or his open market purchases in conjunction with Stephens, Inc. (Tr. Vol. I, at 66, 68). And Metzger did not advise Middendorf that he was representing certain FG investors who might like to have a representative on the Board of Directors. Tr. Vol. III, at 156–57.

67. Even when an FG officer approached Metzger for information about his possible dual representation, Metzger refused to reveal his principals, their intent, or the extent of their acquisitions. On February 1, 1978, Jack Beddow and two FG attorneys met with Metzger in his law offices. Because of unusually heavy trading of FG stock in January and reports of some of Metzger's offers to purchase large blocks of stock, Middendorf had become suspicious about Metzger's activities.[58] At the meeting Beddow attempted to find out who Metzger was representing and the purpose and extent of the acquisitions. Metzger, however, did not reveal his retention by Abedi, the names of any of the Middle Eastern purchasers, or that he had accumulated nearly 20% of FG stock. Tr. Vol. II, at 84–90. In fact, Metzger initially resisted meeting with the FG representatives at all. Then he refused to answer their questions, deferring to Ralph Long, one of his partners, until nearly the end of the meeting. Tr. Vol. II, at 86–87, 89. The meeting ended when Metzger threw Beddow and others out of the office. Tr. Vol. II, at 90; Tr. Vol. III, at 213.

68. Financial General was not informed of Metzger's representation of BCCI or its Middle Eastern clients until after his representation of FG terminated. On February 7, 1978, Middendorf and Saul, then FG's Chairman of the Board (Pretrial Stip. ¶ 71), had a luncheon meeting with Bert Lance. Pretrial Stip. ¶ 25.[59] The purpose of the meeting was to discuss a report that had reached FG of an "Arab raid" led by Lance. Plaintiff's Exh. 54, at 33–39. During and after lunch Lance made it clear that BCCI then owned 20% of FG's stock, planned to buy more, and intended to have control. Plaintiff's Exh. 55, at 193–95.[60] Lance also stated that his group included Metzger. Plaintiff's Exh. 54, at 43–44, 60. This was the first time Middendorf learned of the

---

want to put a representative on the board of directors. Tr. Vol. III, at 154–56.

57. Metzger admitted at trial that when his representation of the investors began on November 30, 1977, his firm was still performing legal services for FG. Rather than discussing the proposed representation with Middendorf, however, Metzger asked Abedi about "the nature of the investment." Upon assuring himself that the investment would "only redound to the benefit of the corporation," Metzger determined that representing the BCCI investors would not conflict with FG's interests. Tr. Vol. III, at 86–87.

58. Through Guy Martin, Middendorf was aware of Metzger's attempt to purchase the FIC stock on behalf of an undisclosed principal, whom Middendorf assumed to be Metzger himself or Jack Stephens. Tr. Vol. I, at 63–65.

Middendorf had also heard of Metzger's approaches to two or three other shareholders. Tr. Vol. II, at 84. Middendorf was not aware of Metzger's open market purchasing program. Tr. Vol. I, at 68.

59. Also present was William F. McSweeney, who arranged and hosted the meeting at the request of Armand Hammer. Plaintiff's Exh. 54, at 33–34.

60. Based on his notes and recollection, Saul testified at his deposition March 7, 1978, that "Mr. Lance said there were three choices, Bill [Middendorf] and I could sell, we could get together or they could take us over. He offered to buy my stock and I declined." Plaintiff's Exh. 55, at 193.

existence of Abedi and BCCI. Tr. Vol. I, at 61–62.[61]

69. Ten days after the February 7, 1978 revelations of Lance, FG commenced this litigation.

### G. *Use of Shareholder List.*

70. Metzger testified at trial that on April 29, 1977, after investing over $1 million of his own money in FG, he asked for and received a list of 1,000 or more FG shareholders. Tr. Vol. III, at 117–18; Tr. Vol. I, at 166–67.

71. In mid-December of 1977, Metzger directed members of his firm to use the shareholder list to get names of large shareholders to solicit. Tr. Vol. I, at 204–05. Members of Metzger's firm contacted three of the names to solicit stock on behalf of the Middle Eastern investors. Plaintiff's Exh. 18.

72. On February 1, 1978, at the meeting with Jack Beddow and two FG attorneys, Metzger admitted that he once had the shareholder list, but thought he had returned it. Tr. Vol. II, at 89–90. At his deposition one month later, Metzger adhered to this position. Plaintiff's Exh. 19, at 44. Beddow, however, testified that FG had never received back the list given to Metzger. Tr. Vol. II, at 89–90. The Court accordingly concludes that Metzger was either unable or unwilling to comply with the request of FG that its shareholder list be returned.

### IV. *CONCLUSIONS OF LAW.*

■ Plaintiff posits that the conduct of Metzger throughout his representation of Financial General violated Canons 4 and 5 of the American Bar Association Code of Professional Responsibility (Code).[62] These two canons delineate the fundamental ethical obligations of loyalty and confidentiality imposed on all attorneys.[63] Canon 5 requires a lawyer to exercise independent professional judgment on behalf of a client. It embodies the duty of undivided loyalty long recognized in common law as the essence of an attorney's fiduciary relationship to his client. *See, e. g., Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 232–33 (2d Cir. 1977); *Bryant v. Lewis,* 27 S.W.2d 604, 606 (Tex.Civ.App.1930). Canon 4 requires a lawyer to preserve the confidences and secrets of a client. It also incorporates ethical precepts fundamental to common law rules governing the fiduciary relationship between an attorney and client. *See, e. g., Reardon v. Marlayne, Inc.,* 83 N.J. 460, 416 A.2d 852, 857–58 (1980). *See generally* H. Drinker, *Legal Ethics,* 103–04, 131–32 (1953); *Developments in the Law—Conflicts of Interest in the Legal Profession,* 94 Harv.L.Rev. 1251–55, 1265–70 (1981).

■ Defendant asserts that the Code cannot be used as a basis for private litigation. In a strict sense, however, the basis for a civil action for disgorgement of attorneys' fees is the common law of fiduciary and ethical obligations. *See, e. g., Fielding v. Brebbia,* 399 F.2d 1003, 1005 (D.C. Cir. 1968); *Zeiden v. Oliphant,* 54 N.Y.S.2d 27, 28 (Sup.Ct.1945); *Bryant v. Lewis,* 27 S.W.2d at 606, 608. Whether or not a breach of those obligations has occurred may be determined by resort to the standards set forth in the Disciplinary Rules. *See, e. g., Jeffry v. Pounds,* 67 Cal.App.3d 6, 136 Cal.Rptr. 373, 376, 377 (1977); *In re Hansen,* 586 P.2d 413, 415 (Utah 1978). As stated in the Preamble and Preliminary

---

**61.** The existence and names of the individual Middle Eastern investors were not revealed until after FG filed suit. Tr. Vol. I, at 63; Plaintiff's Exh. 54, at 204.

**62.** The Code has been adopted by the District of Columbia Court of Appeals and the United States District Court for the District of Columbia. *See* D.C.Ct.App. Bar Rules X; U.S.Dist. Ct.-D.C.R. 4–3(IV). Because the federal rule expressly adopts any amendments made by the local court, the standards governing an attorney's professional conduct are uniform throughout the District of Columbia jurisdiction. *Cf. International Business Machines Corp. (IBM) v. Levin,* 579 F.2d 271, 279 n.2 (3d Cir. 1978).

**63.** As used through this Memorandum, the term "canon" refers generically to the aggregation of Ethical Considerations and Disciplinary Rules that comprise each section of the Code.

Statement to the Code, "The Disciplinary Rules state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." Although it does not "undertake to define standards for civil liability of lawyers for professional misconduct," a violation of its mandatory provisions may be penalized by disciplinary action, disqualification, or disgorgement of attorneys fees. *See, e. g., In re Hansen*, 586 P.2d at 414 (review of state disciplinary proceedings from Code violation); *International Business Machines Corp. (IBM) v. Levin*, 579 F.2d 271, 274 (3d Cir. 1978) (review of disqualification from Code violation); *Jeffry v. Pounds*, 136 Cal. Rptr. at 374 (attorneys' fees refund from Code violation); U.S.Dist.Ct.-D.C.R. 4–3(IV) (acts which violate Code constitute misconduct and are grounds for discipline).[64]

The principal Disciplinary Rules implicated by Metzger's representation of FG are DR 5–101, 5–105, and 4–101. DR 5–101(A) prohibits the dilution of loyalty to a client by the attorney's own personal or financial interests. It states:

> Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.

DR 5–105 bars the acceptance and continuation of employment by clients with adverse interests. It provides:

> (A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).
>
> (B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

Subsection (C) allows multiple representation only if "it is obvious that [the lawyer] can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each." DR 4–101(B) prohibits a lawyer from revealing the confidential information imparted by his client:

> (B) Except when permitted under DR 4–101(C), a lawyer shall not knowingly:
>
> (1) Reveal a confidence or secret of his client.
>
> (2) Use a confidence or secret of his client to the disadvantage of the client.
>
> (3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.

As illuminated by pertinent Ethical Considerations (EC's), formal and informal opinions of the American Bar Association Committee on Ethics and Professional Responsibility (ABA Ethics Committee),[65] opinions of the District of Columbia Bar Legal Ethics Committee (D.C. Legal Ethics

---

**64.** Analysis of a particular attorney-client relation thus consists of two parts: whether a violation has occurred, and if so, the proper remedy for the breach. *See IBM v. Levin*, 579 F.2d at 279, 283. Since attorney discipline, disqualification, and disgorgement of attorneys' fees share the same ultimate prophylactic purpose, case law on the issue of a particular Code violation should be generally applicable regardless of the sanction sought. *See Developments in the Law*, 94 Harv.L.Rev. at 1471.

**65.** Formal opinions respond to questions of widespread interest, whereas informal opinions respond to questions "comparatively narrow in scope." ABA, *Opinions of the Committee on Professional Ethics* 6 (1967); ABA Standing Committee on Ethics and Professional Responsibility, Rules of Procedure 3.

Committee),[66] and judicial precedent, these are the standards against which Metzger's conduct as attorney for Financial General is measured.

### A. *Identity of Corporate "Client".*

■ Like any other corporate attorney, Metzger could not fulfill his duty of undivided loyalty to FG without first determining who, among the corporation's directors, officers, and shareholders, in theory and in fact represented the entity's interests. EC 5–18, the only Code provision that expressly addresses this subject, provides limited guidance. It states:

> A lawyer employed . . . by a corporation . . . owes his allegiance to the entity and not to a stockholder, director, officer, employee, representative, or other person connected with the entity. In advising the entity, a lawyer should keep paramount its interests and his professional judgment should not be influenced by the personal desires of any person or organization.

In theory, the ultimate interests of the entity are those of the shareholders. They own the corporation and elect its directors; it is for their collective benefit that the board exercises its policymaking authority. In practice, the spokesmen for the corporation are its managers. Subject to the board's final authority, the incumbent management runs the corporation, determining on a daily basis the interests of the entity and translating those interests into business decisions. Some of these decisions are what attorneys to hire and what legal tasks to perform. Thus, both practically and theoretically, the corporate attorney should consider himself as representing the entity interests articulated by those in current control of the management. *See* ABA Informal Opinion 1056 (1968);[67] ABA Division of Education, Professional Education Publications, *Professional Responsibility, A Guide for Attorneys* 271, 277–79 (1978); *Developments in the Law*, 94 Harv.L.Rev. at 1334–36.

When Metzger began to perform legal services for FG in June of 1977, the management hierarchy of FG was indisputably headed by Middendorf. As of June 20, Middendorf was President, Chief Executive Officer, and Chairman of the Board. Finding of Fact 11. He was the controlling shareholder as well, holding proxies on 41.6% of the voting stock. Finding of Fact 10. Throughout the course of Metzger's representation, Middendorf retained these positions. Among FG's shareholders, directors, and officers, no other individual could reasonably have been deemed to be the spokesman for the entity's interests.

Of this Metzger was well aware. Middendorf was the sole company official to authorize and direct Metzger's legal work. In the early months of Metzger's representation, the authorization was informal, but understood. Finding of Fact 22. When a dispute arose over the size of Metzger's bills, Middendorf's status as the sole official to authorize, limit, and terminate Metzger's legal work became express. Findings of Fact 24–25. And from his three-month involvement in FG politics as attorney for the Middendorf investors and a major new investor, Metzger was familiar with the proxies and board nominations that brought Middendorf into control. Findings of Fact 6, 8–12.

---

**66.** Opinions of the D.C. Legal Ethics Committee on questions arising under the Code are advisory only. *Code of Professional Responsibility and Opinions of the D.C. Bar Legal Ethics Committee* 73 (no date).

**67.** ABA Informal Opinion 1056 (1968) addressed the propriety of corporation counsel advising the president of his client corporation on how to conduct an upcoming election of directors to frustrate a minority attempt to obtain representation on the board. In concluding that the advice could properly be given, the Ethics Committee reasoned:

> In acting as counsel for a corporation a lawyer not only may but should give legal advice to its officers in all matters relating to the corporation as long as they are in office, except in situations where to his knowledge the interests of the officers are adverse to the interests of the corporation and the giving of the advice would be contrary to the interests of the corporation.

In sum, Metzger's duty of undivided loyalty to his client corporation should have been directed toward advancement of the corporate goals articulated by Middendorf as the incumbent manager of FG.

### B. Secret Participation in Watergate Group.

Plaintiff asserts that Metzger's participation in the Watergate group violated two Canon 5 obligations peculiar to corporate attorneys: to remain neutral in the face of a corporate client's factional conflict, and to subordinate to the fiduciary obligations of an attorney any privileges otherwise accruing as a shareholder. The Court agrees with both contentions.

### 1. Requirement of Neutrality.

■ A corollary of the duty of undivided loyalty, or as stated in DR 5–105, the duty to exercise "independent professional judgment in behalf of a client," is the requirement that a corporation's legal adviser remain neutral when confronted with an internecine conflict. As stated by the ABA Ethics Committee in a seminal 1932 formal opinion,

> In acting as the corporation's legal adviser [an attorney] must refrain from taking part in any controversies or factional differences which may exist among stockholders as to its control. When his opinion is sought by those entitled to it, or when it becomes his duty to voice it, he must be in position to give it without bias or prejudice and to have it recognized as being so given. Unless he is in that posi-

tion his usefulness to his client is impaired.

ABA Opinion 86 (1932). Since then, the Ethics Committee has consistently adhered to its interpretation of Canon 5 as prohibiting a corporate attorney from taking part in factional differences among the shareholders, management, or directors of a corporation. See ABA Informal Opinion 516 (1962); ABA Informal Opinion 1056 (1968).[68]

The same principle of neutrality was applied by this Circuit in *Yablonski v. United Mine Workers*, 448 F.2d 1175 (D.C.Cir.1971) (per curiam), *later appeal*, 454 F.2d 1036 (D.C.Cir.1971) (per curiam), *cert. denied*, 406 U.S. 906, 92 S.Ct. 1609, 31 L.Ed.2d 816 (1972). In a struggle for power between certain members of the United Mine Workers of America (UMWA) and incumbent UMWA officers, the court ruled that outside and inhouse counsel should represent neither side. The court reasoned: "The corporation has certain definite institutional interests to be protected, and the counsel charged with this responsibility should have ties on a personal basis with neither the dissident stockholders nor the incumbent officeholders." 448 F.2d at 1181.

■ The Code encompasses this proscription in DR 5–105(A) and (B) and EC 5–14.[69] The sections preclude continued employment when an attorney is faced with the likelihood of involvement in the representation of "differing interests." Like any situation of multiple employment, continued representation of the corporate client in

---

**68.** In Informal Opinion 516 (1962), the Ethics Committee relied on its reasoning in Opinion 86 to prohibit counsel for a corporation from representing one or more of the stockholder-directors in proceedings to liquidate the corporation. The attorney believed that improper management of the corporation had resulted in a three-year loss of money, and was willing to resign as attorney for the corporation to represent the other dissident shareholders. Nevertheless, the Committee determined that the loyalty owed to the corporate client prevented the attorney from following that course. And in Informal Opinion 1056 (1968), the Ethics Committee summarized its two previous opinions on factional conflicts. In situations of conflict of interest such as the "conduct of stockhold-

ers' meetings, contests in elections of directors, solicitations of proxies, tender offers from outsiders, disclosures to both present and potential stockholders of information concerning the corporation and its affairs," the Ethics Committee concluded that professional involvement of the corporate attorney should be limited to the giving of advice to the incumbent management.

**69.** EC 5–14 states:

Maintaining the independence of professional judgment required of a lawyer precludes his acceptance or continuation of employment that will adversely affect his judgment on behalf of or dilute his loyalty to a client.

spite of differing internal interests should be permitted only if it, represented by incumbent management, consents after full disclosure. DR 5–105(C).

Metzger's allegiance to the incumbent management of FG was almost immediately put to the test. In late June of 1977, Metzger was invited to attend a meeting at the Watergate of six major shareholders/directors unhappy with Middendorf's management. By that time, Metzger was well into his representation of FG. He had already accumulated 507 hours for his corporate client, for which he would bill FG over $45,000. Findings of Fact 17, 21. His simplest option, and one dictated by his duty to FG, the President and Chief Executive Officer of which was Middendorf, would have been to advise Middendorf of the invitation to attend the June 30, 1977 Watergate meeting. Middendorf could then have advised Metzger with respect to attending and reporting on that and any subsequent meetings. Instead, Metzger chose to attend the meeting, without disclosing his intent to attend or even notifying Middendorf of the fact the meeting was planned. Finding of Fact 40.

By the end of the first Watergate meeting, it should have been apparent to Metzger that by any definition of "differing interests," [70] the Watergate group involved a faction with divergent views from Middendorf on the needs of Financial General. The group opposed Middendorf on the choice of a general counsel, the need to sever ties with IB, and the identity of a Chief Operating Officer. Findings of Fact 32, 34. There is even some suggestion that the group opposed Middendorf personally, to the extent that the role of Chief Operating Officer was contemplated as replacing, rather than supplementing, the key operational responsibility assumed by Middendorf. Finding of Fact 34 n.33. Metzger's personal support of these views clearly would diminish the zeal with which he would perform for FG at Middendorf's be-

hest. Nevertheless, Metzger declined even to join the post-Watergate meeting discussion with Middendorf, and did not otherwise advise Middendorf of his participation in or sympathy with the group. Findings of Fact 35, 40.

As the group's opposition continued into July, it should have become increasingly clear to Metzger that he could not advance the positions held by the Watergate group without at the same time threatening the ability of Middendorf to exercise control over the operations of FG. The Watergate faction included the major shareholders/directors from the Middendorf investors: over one-half of Middendorf's board nominees and one-third of the total board of directors. Findings of Fact 8, 11, 33. In addition, they supplied a substantial portion of the proxies forming the basis of Middendorf's voting control; their revocation would reduce Middendorf's holdings from 41.6% to 26.2%. Findings of Fact 10, 33. Metzger still failed to advise Middendorf, or the full board, of his participation in the group, even after being invited by Middendorf into the second post-Watergate discussion to draft proposed by-law changes. Finding of Fact 37.

The potential threat to the management of FG was not lost on the SEC, which took steps in August to obtain information about the rumored "pro- and anti-Middendorf factions." Findings of Fact 18, 38. A change in the control of FG also carried serious implications with respect to the Federal Reserve Board, which in the summer of 1977 was in the process of determining whether to require complete divestiture of General Olmsted's interests. Finding of Fact 5. Since he drafted the proxies consolidating control in Middendorf, filed Middendorf's 13D, and appeared with certain of the Middendorf investors at Federal Reserve Board hearings (Findings of Fact 6, 12), Metzger could not have missed the implications of the SEC's interest and the Federal Reserve Board's potential interest in the intra-board

---

**70.** The Code defines "differing interests" as "every interest that will adversely affect either the judgment or the loyalty of a lawyer to a client, whether it be a conflicting, inconsistent, diverse, or other interest." Definitions (1).

conflict. Nevertheless, Metzger continued to withhold the fact of his personal participation in the first two Watergate meetings, even after communicating with Middendorf on the subject of the SEC request. Findings of Fact 18, 38, 40.

In short, through the months of June and July of 1977, and again in December, Metzger actively represented FG while secretly supporting a dissident group of shareholder/directors, in violation of his professional obligations toward FG.

### 2. *Status as FG Shareholder.*

Metzger asserts that as a shareholder of FG he retained the right to express his views on the management of the company. Had he not also been an attorney for the corporation, he would, indeed, have been free to join the Watergate group. Metzger, however, fundamentally misconstrued the significance of his dual status as shareholder in and attorney for the same entity.

■ Because "what is in the best interests of the corporation" generally furthers an individual's interests as a stockholder, the lawyer-shareholder combination is not prohibited. ABA Informal Opinion 1057 (1968). But the combination is subject to the limits set forth in DR 5–101: the professional employment may not be affected by the lawyer's own personal interests.[71] When an attorney's privileges as a shareholder collide with his obligations as a lawyer for the company in which he has invested, the lawyer's professional obligations

predominate. Formal Opinion 86 (1932).[72] At that point, the attorney should advise the corporate client to seek outside counsel. ABA Informal Opinion 1057 (1968). If that is not appropriate, the attorney should relinquish his privileges as a shareholder, ABA Opinion 86 (1932), or resign. *See* DR 2–110(B)(2), 2–110(C)(2).

In like manner, any privilege of Metzger as a major FG shareholder to dissent from the business decisions made by Middendorf should have been subordinated to his obligation as counsel for FG to adopt as his own the views of incumbent management.

### C. *Solicitation of Foreign FG Buyer.*

Plaintiff contends that Metzger's October Have Gun Will Travel letter breached fiduciary and ethical obligations arising under Canons 5 and 4. With regard to both theories, the Court agrees.

### 1. *Personal Interest in Sale.*

DR 5–101, as discussed, encompasses the situation in which an attorney has invested in his client corporation. Acceptance or continuation of the employment is not prohibited,[73] but only with full disclosure to incumbent management and only so long as the personal interests do not affect the exercise of professional judgment on behalf of the corporation.

In this case, there is no doubt that Metzger continued to represent FG in October of

---

**71.** The prohibition of DR 5–101 was also implicated with respect to Metzger's desire to become general counsel for FG, or at least expand the scope or extent of his legal activities on its behalf. That is, one of the objectives of the Watergate group was to sever the relationship with FG's existing general counsel. The possibility then existed, recognized by several members of the Watergate group, that Metzger's influence could correspondingly expand. See Findings of Fact 31, 34.

**72.** In Formal Opinion 86 (1932), the ABA Ethics Committee ruled it improper for an attorney who was general counsel, stockholder, and director of a corporation to become involved in factional differences among stockholders. As a shareholder the attorney had the privilege of

soliciting proxies in a contested election of directors. That privilege, however, "must be subordinated to [the attorney's] professional obligations to the corporation."

**73.** DR 5–101(A) refers expressly to the "acceptance" of employment. It does not refer to conflicts arising after employment has begun. That prohibition falls within the scope of DR 5–105(B), which proscribes continued employment when the attorney is likely to become involved in representing differing interests. EC 5–2 further states: "After accepting employment, a lawyer carefully should refrain from ... assuming a position that would tend to make his judgment less protective of the interests of his client."

1977;[74] by ironic coincidence, Metzger's September bill to FG for $5,331.86 shared the October 14, date of the Have Gun Will Travel letter to McColl. Findings of Fact 21, 42. There is also no doubt that Metzger would have profited by over $1,000,000 on the sale of his own stock, had his plan been adopted as proposed. Finding of Fact 43. The issue is thus whether Metzger's contemplated pecuniary gain as a shareholder would reasonably be predicted to affect his obligations to the corporation.[75]

As proposed in the Have Gun letter, Metzger's plan to sell FG conflicted with several prerogatives of FG management. In his June "Where Do We Go From Here?" memorandum, Metzger had recommended "freezing out" the minority shareholders in FG's subsidiary banks. Findings of Fact 16, 30. The proposal not only was expressly rejected by Middendorf, but was a cause of the increasing friction with Metzger. Finding of Fact 30. Metzger's revival of the theory in his plan to sell FG to a foreign investor effectively substituted his own business judgment for the contrary views of FG's elected managers.[76]

The outlined sale of control raises similar conflicts. Particularly in view of the contemporaneous Federal Reserve Board proceedings and the SEC's expressed interest in challenges to Middendorf's control, the incumbent management would have been likely to oppose or at a minimum supervise any such sale of control. See Findings of Fact 5, 18. Moreover, there is a clear conflict between representation of both an entity and its potentially controlling investors.

If the new shareholders turn out to be looters, the incumbent management, and its attorney, may be required to oppose the acquisition. See generally Developments in the Law, 94 Harv.L.Rev. at 1348. And, finally, Metzger deprived FG's management of the opportunity to negotiate for its shareholders the favorable premiums Metzger proposed for the exclusive benefit of himself and seven other major shareholders. Finding of Fact 42.

■ Metzger's defense to this Canon 5 violation is that the plan outlined in the Have Gun Will Travel letter was never adopted. In his view, the proposal implicated no conflicting interests because it involved no other client,[77] no actual buyers, and no resulting employment. As a factual matter, Metzger is incorrect. See Finding of Fact 47. Metzger is also in error as a matter of law. Lack of actual injury to the client or profit to the attorney is no defense to a fiduciary's breach of his duty of loyalty; the harm is in the attorney exposing himself to the potential conflict. See, e. g., Ames v. State Bar, 8 Cal.3d 910, 106 Cal. Rptr. 489, 495, 506 P.2d 625, 631 (1973); In re Boivin, 271 Or. 419, 533 P.2d 171, 175–76 (1975). Thus, whether or not Metzger's plan was accomplished, his personal stake in the scheme to sell FG impermissibly diluted his loyalty to the corporate client.

### 2. Use of Confidential Information.

Apart from Canon 5 problems with the October 14 letter, Metzger's promulgation of the plan to sell FG breached his Canon 4

---

**74.** See Findings of Fact 17, 21, 25, 26.

**75.** Metzger does not contend that he ever disclosed the letter or its contents to FG. The record establishes that no disclosure was ever made. Finding of Fact 46.

**76.** Metzger strenuously contends that the majority shareholders of a corporation have no duty to the minority, particularly with respect to freeze-outs. Without intimating any view on the merits of this position, the Court notes that the argument misses the mark. Metzger was not acting at the request of the majority of shareholders or management, but was proposing a management decision unknown to and contrary to the express wishes of the manage-

ment. The critical fiduciary obligation was thus not any duty running from majority shareholders (or management acting at their behest) to minority, but the duty running from Metzger as attorney to his client corporation.

**77.** Metzger overlooks the fact that the letter was sent to another of his clients, NCNB Corp. The possible DR 5–105 multiple employment problem thereby raised is of less significance than the personal interest aspect of the plan, however, since whatever authorization McColl may have given to Metzger to formulate a plan to sell FG was promptly withdrawn. See Finding of Fact 41.

duty to refrain from using the confidences or secrets of a client to the disadvantage of the client or advantage of himself. DR 4–101(B)(2), (3).

As attorney for FG, Metzger performed a broad array of legal assignments. Findings of Fact 16, 17, 18. He billed a substantial number of hours on two that particularly involved access to and familiarity with FG's financial and structural data: the "Where Do We Go From Here?" memoranda and the work on the Northern Virginia merger. Metzger's offer of his own services to any interested investor was premised on this very familiarity with FG's finances and structure. Indeed the clear implication of the final paragraph of the Have Gun Will Travel letter was that Metzger was willing to use confidential information about FG for the benefit of any investor willing to pay his legal fees. See Finding of Fact 44.

Metzger contends that no violation of DR 4–101 occurred because he actually obtained no confidential information from his work for FG. Again, this assertion is irrelevant. Metzger was in a position to receive confidential information throughout his representation of FG. Even without proof of an actual receipt or disclosure of such information, a Canon 4 violation may be established. See *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d at 233, 235–36; *NCK Organization, Ltd. v. Bregman*, 542 F.2d 128, 134–35 (2d Cir. 1976).

### D. Representation of Middle Eastern Investors.

Plaintiff contends, and the Court agrees, that Metzger's most flagrant breach of his duty of undivided loyalty to FG occurred with his simultaneous representation of FG and the Middle Eastern clients of BCCI. From November 30, 1977 through January 31, 1978, Metzger represented BCCI and its clients in the purchase of nearly 20% of FG's stock. Findings of Fact 48, 56, 57, 58. In the same period, Metzger performed legal services for FG for which he subsequently billed the corporation $6,446.65. Findings of Fact 19, 20, 21. Although in January of 1978 his hours for FG were

greatly reduced, the last formal communication from FG left open the possibility that new assignments might be made at any time. Finding of Fact 25; *see IBM v. Levin*, 579 F.2d at 281. In fact, Metzger's representation of FG continued until the company became suspicious of potentially conflicting employment. See Findings of Fact 29, 67, 68. It is consequently beyond dispute that Metzger engaged in substantial, concurrent representation both of Financial General and the BCCI clients.

DR 5–105 prohibits such dual representation without the informed consent of both clients if the attorney's independent professional judgment "will be or is likely to be adversely affected." Metzger's argument that the dual employment involved unrelated matters is immaterial. The duty of undivided loyalty requires a lawyer not only to advance the principal matter for which he was retained, but also to protect his client's interests in all other respects. *See, e. g., Jeffry v. Pounds*, 136 Cal.Rptr. at 376; *Grievance Committee v. Rottner*, 152 Conn. 59, 203 A.2d 82, 84 (1964). The bar of simultaneous representation consequently extends to employment by two clients in unrelated matters, as long as their interests are potentially adverse in at least one. *See, e. g., IBM v. Levin*, 579 F.2d at 279–80; *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386–87 (2d Cir. 1976).

#### 1. Potential Adversity of BCCI's and FG's Interests.

Metzger asserts that when he accepted employment by BCCI, there was no possibility of conflict with FG because he had no way of foreseeing the amount or market effect of the BCCI purchases. Metzger further argues that there was no conflict in his continued representation of FG after subsequent Middle Eastern investors developed, because he represented the investors as separate individuals, not as a group. Neither assertion has merit.

It takes no clairvoyance to discern the potential conflict with FG's interests of the representation proposed by Abedi on No-

vember 30, 1977. Metzger knew there was to be more than a single investor and more than a single block of stock purchased. He knew that the investors had substantial funds at their disposal and that Abedi contemplated a position on the FG board. He knew that the purchases were to be made without revealing the identity of the principals. See Findings of Fact 48, 49, 61, 64. And he knew that with Abedi as the common agent of the BCCI clients, the potential investors would likely be viewed as a control group for the purposes of filing disclosure statements. Finding of Fact 63. The obvious inference is that Abedi intended to purchase a controlling share of FG stock for his BCCI clients.

This perception should have been confirmed with the addition of the second, third, and fourth purchasers in January. To prevent disclosure of the program of open market and private transactions, the open market purchases were carefully controlled to prevent drastic increases, the purchases were in the name of Metzger as agent, the identities of the investors remained undisclosed, and the stock accumulated for each investor was kept below 5% to avoid the need for filing a Schedule 13D disclosure statement. Findings of Fact 55, 59, 60. In recognition of this potential for control, Metzger even took some affirmative steps to file the requisite statements

and seek an appropriate representative for the FG board. Findings of Fact 63, 64.[78]

The essence of the program—and of Metzger's conflict—was secrecy. If FG management became aware of the activities of Metzger and BCCI, the attempt to purchase a controlling share of FG stock would be resisted. It is evident that a controlling share of FG stock cannot be held both by the BCCI clients and by the Middendorf investors. BCCI and Middendorf cannot both fill the same directors positions, nor can they both constitute the incumbent management of the corporation. Metzger's attempted representation of both of these entities thus placed him in a classic position of conflict of interest. As stated in old Canon 6, the forerunner of Canon 5, "Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose." ABA Canon 6 (1937); see Yablonski v. United Mine Workers, 448 F.2d at 1179; Estates Theatres, Inc. v. Columbia Pictures Industries, Inc., 345 F.Supp. 93, 99 (S.D.N.Y.1972); In re Holmes, 290 Or. 173, 619 P.2d 1284, 1287 (1980) (per curiam); Jedwabny v. Philadelphia Transportation Co., 390 Pa. 231, 135 A.2d 252, 254 (1957), cert. denied, 355 U.S. 966, 78 S.Ct. 557, 2 L.Ed.2d 541 (1958); Bryant v. Lewis, 27 S.W.2d at 607.[79]

**78.** Any acquisition of control by the Middle Eastern investors necessarily involved extinguishing some of the proxies held by Middendorf. See Findings of Fact 6, 64. The duty of loyalty, however, precludes an attorney who has "switched sides" from attacking his work product generated for a former client. See, e. g., ABA Opinion 71 (1932); In re Evans, 113 Ariz. 458, 556 P.2d 792, 795 (1976).

**79.** Metzger contends that because his two clients were not engaged in litigation, no simultaneous representation problem existed. This position is not supported by case law or by the Code. DR 5–105 keys the proscription on multiple employment to "representation," not to litigation. EC 5–15 does make a distinction between representation in litigation and in matters not involving litigation, stating,

[T]here are few situations in which [a lawyer] would be justified in representing in litigation multiple clients with potentially differing interests .... On the other hand, there

are many instances in which a lawyer may properly serve multiple clients having potentially differing interests in matters not involving litigation. If the interests vary only slightly, it is generally likely that the lawyer will not be subjected to an adverse influence and that he can retain his independent judgment on behalf of each client.

Representation in litigation is thus a single factor in assessing the extent and effect of adverse interests. In this case, Metzger actively advanced the interests of his BCCI clients at the expense of the interests of the incumbent management of FG. His role is clearly distinguishable from that of a passive adviser or scrivener occasionally permitted to represent multiple clients in a single nonlitigation transaction with full disclosure and consent. Cf. D.C. Legal Ethics Committee Opinion 49 (1978), 54 (1978); City of Cleveland v. Cleveland Electric Illuminating, 440 F.Supp. 193, 208 (N.D.Ohio 1977). Rather, Metzger's position is analogous to the attempted representation by a single attorney

### 2. *Disclosure to Financial General Management.*

In light of the potential adverse impact on Metzger's loyalty to FG, Metzger was barred from undertaking or continuing employment by BCCI without the informed consent of the incumbent management of FG. DR 5–105(C). Metzger contends that such disclosure was made. In his view, the duty to disclose his dual representation was satisfied by his inquiry to Abedi of the investors' motives and the subsequent filtering back to Middendorf of his purchasing activities on behalf of an undisclosed principal. See Findings of Fact 65, 67 n.58. As Metzger testified at trial, "I suppose I always had a chance to tell anybody anything I was doing the last few months. Did anybody ask me? No." Tr. Vol. III, at 209–10.

■ Metzger's formulation of his duty to disclose is at odds with common law and Canon 5. The burden was on Metzger to approach FG and make an affirmative disclosure. *See, e. g., IBM v. Levin*, 579 F.2d at 281; *E. F. Hutton & Co. v. Brown*, 305 F.Supp. 371, 398 (S.D.Tex.1969); *Bryant v. Lewis*, 27 S.W.2d at 607. Disclosure was required to be made to both clients, so that both could evaluate the potential conflict and decide whether to consent to or oppose continued employment. *See, e. g., IBM v. Levin*, 579 F.2d at 281; DR 5–105(C); EC 5–16, 5–19; D.C. Legal Ethics Committee Opinion 49 (1978), 27 (1977). Metzger could not shift this burden by relying on rumors and reports of certain of his purchases. *IBM v. Levin*, 579 F.2d at 281–82. Full disclosure means just that—affirmative revelation by the attorney of all the facts, legal implications, possible effects, and other circumstances relating to the proposed representation. A client's mere knowledge of the existence of his attorney's other representation does not alone constitute full disclosure. *See In re Holmes*, 619 P.2d at 1287–89; *Bryant v. Lewis*, 27 S.W.2d at 607; DR 5–105(C); EC 5–16.

By these standards, Metzger's asserted disclosure to FG was inadequate. During the entire months of December 1977 and January 1978 he made no affirmative approach to Middendorf or any other FG officer to reveal any aspect of his BCCI representation. Finding of Fact 66. Even when specifically quizzed by an FG official about the extent and nature of his suspected representation, Metzger revealed no more information than the fact he was purchasing stock for undisclosed principals. Finding of Fact 67. Although Middendorf was aware of some of Metzger's purchases in December, he did not learn of Metzger's BCCI representation until after Metzger's employment was terminated. At that, the disclosure came from someone else. Findings of Fact 67 n.58, 68. Under these circumstances, Metzger failed to comply with his duty to disclose to FG his conflicting representation of BCCI.

### 3. *Use of Shareholder List.*

Metzger's retention by BCCI implicated concerns expressed in Canon 4 as well as Canon 5. DR 4–101(B)(3) prohibits an attorney from using a confidence or secret of his client "for the advantage of himself or of a third person, unless the client consents after full disclosure." Subsection (A) defines "secret" to include "other information [than that protected by the attorney-client evidentiary privilege] gained in the professional relationship that the client has requested be held inviolate." By statute and at common law, release of a corporation's shareholder list ordinarily is conditioned on demonstration of a "proper purpose" related to the shareholder status of the requester. *See, e. g.,* D.C.Code Ann. § 29–920 (1973); Va.Code Ann. § 13.1–47 (Michie 1979); *Kerkorian v. Western Air Lines, Inc.*, 253 A.2d 221, 222–23 (Del.Ch.), aff'd, 254 A.2d 240 (Del.1969); *Bank of Giles County v. Mason*, 199 Va. 176, 98

---

of two claimants to an estate not large enough to support both, or the attempted negotiation by a single attorney of the debts owed by one client to another. Both of these situations have been deemed to involve a conflict of interest

too patent to allow multiple representation even with full disclosure and consent. *See Bryant v. Lewis*, 27 S.W.2d at 607; *In re Holmes*, 619 P.2d at 1289.

S.E.2d 905, 908 (1957). To the extent that access to a shareholder list is otherwise foreclosed, the list may be considered to be information "the client has requested be held inviolate." Although Metzger did not initially obtain the list in his professional relationship to FG (see Finding of Fact 70), like his other privileges as a shareholder, his use of it was circumscribed by the fiduciary obligations that arose when he was retained to be FG's attorney. Subsequently using the list to solicit potential investors in FG without the permission of or disclosure to the incumbent management (see Findings of Fact 71, 72) violated the express proscription of DR 4–101(B)(3).[80]

### E. *Conclusion.*

At trial Metzger testified, "[T]he situational ethics of the Canons of Ethics is not the kind of thing by which I govern my conduct." Tr. Vol. III, at 149. His conduct as FG's attorney reveals the unfortunate truth of that assertion. From the outset of his representation, Metzger's attitude toward FG was marked by bad faith, secrecy, and self-dealing. He persistently placed his prerogatives as a shareholder above his fiduciary obligations as an attorney, substituting his own business judgment for that of the corporation he was hired to serve. His behavior fell far short of the high standards imposed on lawyers by common law and by the Code of Professional Responsibility.

## V. *AFFIRMATIVE DEFENSES.*

Metzger seeks to avoid all liability with the affirmative defenses of unclean hands and accord and satisfaction. Although the defenses were pleaded in accordance with rule 8(c) of the Federal Rules of Civil Procedure,[81] Metzger presented no supporting evidence or argument at trial. His post-trial arguments indicate that neither defense is applicable.

For the doctrine of unclean hands to apply, defendant must establish misconduct on the part of the plaintiff in the same transaction about which plaintiff complains. *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245, 54 S.Ct. 146, 147, 78 L.Ed. 293 (1933). Metzger specifies no misconduct by FG at all, much less misconduct directed towards Metzger or his attorney-client relationship with the corporation. This doctrine, accordingly, provides Metzger with no defense.

A fundamental tenet of the doctrine of accord and satisfaction is that when the payment designated as accord and satisfaction is made, both parties intend it to terminate a then-existing controversy. *Louis Schlesinger Co. v. Kresge Foundation*, 388 F.2d 208, 210 (3d Cir.), *cert. denied*, 391 U.S. 934, 88 S.Ct. 1847, 20 L.Ed.2d 854 (1968). Metzger's theory of accord and satisfaction is based on FG's December 20, 1977 payment in settlement of Metzger's first four months of legal bills. The payment, however, resolved only a dispute over the size of the bills. It did not relate to Metzger's entitlement to be paid at all. Although some of the conduct forming the basis of this litigation had occurred by then, it had not been disclosed to FG. Thus, at the time of the December 20 payment, no controversy over Metzger's fiduciary obligations to FG existed. The doctrine of accord and satisfaction is not a defense.

A third defense raised by Metzger is the alleged failure to join his law firm as a defendant. Metzger asserts that the firm, Metzger, Shadyac, & Schwarz, is an indispensable party within the meaning of

---

**80.** Metzger argues that since FG management could use the shareholder list as it chose, so could he as a shareholder. This argument again ignores the critical distinction between the general role of incumbent management and Metzger's fiduciary obligation as FG's attorney. Moreover, an attorney's duty to preserve the confidences and secrets of his client is not lessened by the fact that the relevant confiden-

tial information may be available to corporate officers or directors. *See NCK Organization v. Bregman*, 542 F.2d at 133. *See generally* H. Drinker, *Legal Ethics* 135 (1953).

**81.** Answer to Verified Supplemental Amended Complaint, Affirmative Defenses (Sept. 10, 1980); Answer to Verified Amended Complaint ¶¶ 66, 87 (May 15, 1978).

rule 19 of the Federal Rules of Civil Procedure because it was the recipient and beneficiary of the funds plaintiff now seeks to recover. The Court does not agree.

Federal Rule 19(a)(1) requires the joinder of a person if "in his absence complete relief cannot be accorded among those already parties." This is not the case here. Under the Uniform Partnership Act adopted in the District of Columbia, a partnership and all of its partners are jointly and severally liable to third parties for the wrongful acts of any copartner. D.C.Code Ann. § 41–314 (1973); *see Philips v. United States,* 59 F.2d 881, 887 (D.C.Cir.), *cert. denied,* 287 U.S. 639, 53 S.Ct. 88, 77 L.Ed. 553 (1932). Complete relief may therefore be accorded FG without joinder of the partnership.

In the alternative, subsection (a)(2) of rule 19 requires joinder if the person to be joined "claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." Again, this situation does not arise here. Metzger's counsel throughout this litigation has been his own law firm. As a practical matter, it is difficult to discern how the firm's interests might have been more vigorously pursued had it instead stood as defendant. *Cf. Smith v. Mandel,* 66 F.R.D. 405, 409 (D.S.C.1975).

## VI. *SANCTIONS.*

Plaintiff seeks disgorgement of $80,-284.12 in fees paid to Metzger on December 20, 1977. Plaintiff also requests exoneration from payment of the $15,261.95 in legal bills outstanding, and punitive damages in the suggested amount of at least twice the compensatory damages awarded.

 It is well established that an appropriate sanction for breach of an attorney's fiduciary duties to his client is denial of compensation or return of fees already paid. *See, e. g., Woods v. City National*

*Bank and Trust Co.,* 312 U.S. 262, 267–68, 61 S.Ct. 493, 496–97, 85 L.Ed. 820 (1941); *Silbiger v. Prudence Bonds Corp.,* 180 F.2d 917, 920–21 (2d Cir.), *cert. denied,* 340 U.S. 831, 71 S.Ct. 37, 95 L.Ed. 610 (1950); *Zeiden v. Oliphant,* 54 N.Y.S.2d at 29; *Jeffry v. Pounds,* 136 Cal.Rptr. at 377; *Bryant v. Lewis,* 27 S.W.2d at 608; *In re Hansen,* 586 P.2d at 417. As stated in *Silbiger v. Prudence Bonds Corp.,* 180 F.2d at 920–21,

> Certainly by the beginning of the Seventeenth Century it had become a commonplace that an attorney must not represent opposed interests; and the usual consequence has been that he is debarred from receiving any fee from either no matter how successful his labors.... [T]he prohibition is absolute and the consequence is a forfeiture of all pay.

The Court has found that Metzger's conflicting activities began as early as June 30, 1977 and extended continuously through the end of January, 1978. FG accordingly is entitled to a refund of the payment it has made on Metzger's June through September bills, and is excused from payment of any sum on the outstanding October through January bills.

 Although punitive damages are not favored, they may be awarded to punish and deter outrageous conduct. *Knippen v. Ford Motor Co.,* 546 F.2d 993, 1002 (D.C.Cir. 1976). The critical question is the willfulness of the defendant's conduct:

> Actual malice is not required but defendant must act with such conscious and deliberate disregard of the consequences of his actions to others that his conduct is wanton.

*Id.; see Franklin Investment Co. v. Smith,* 383 A.2d 355, 358 (D.C.1978). In the Court's view, Metzger's conduct during his professional affiliation with FG exhibits a sufficiently wanton and reckless disregard for his fiduciary obligations to support an award of punitive damages.

Metzger held himself out to the public as an experienced bank attorney in whom his clients could place trust and confidence. When hired by Financial General, he at-

tempted to persuade its management to increase his already substantial legal obligations. Instead of protecting and advancing the corporation's interests, however, he engaged in a pattern of activities that generated increasingly serious conflicts of interest with his client. Within two weeks of his retention, Metzger joined a dissident group of directors. The group had the will and apparent ability not only to expand Metzger's professional role for the corporation but also to displace its management. Several months later, while continuing to bill FG substantial sums for his services, he held himself out as willing to sell his legal services and inside knowledge of Financial General to any interested investor. Shortly thereafter, he embarked on a surreptitious program to purchase a controlling share of FG's voting stock on behalf of clients with an expressed interest in the management of the corporation. In spite of many opportunities to reveal to FG's incumbent management the conflicting activities in which he was engaged, Metzger at no time made any attempt to do so.

In circumstances involving less egregious and protracted conduct by a fiduciary, this Circuit has upheld an award of punitive damages. *See Brown v. Coates*, 253 F.2d 36 (D.C.Cir.1958). An award of punitive damages in this case is warranted. Indeed, in light of Metzger's continuing lack of remorse or willingness to acknowledge even the possible appearance of impropriety,[82] an award of punitive damages is compelled. The Court therefore adds to the award of

$80,284.12 in attorneys' fees an equal amount as punitive damages. The total award in favor of plaintiff is $160,568.24.

---

**82.** At trial Metzger maintained that the Have Gun Will Travel letter and the purchases of the Middle Eastern investors were "none of Mr. Middendorf's business." Tr. Vol. III, at 174, 213. In response to questioning by opposing counsel, he refused to concede that even in retrospect his activities might appear to be improper:

Q. Do you recall telling this Court that you felt that your reputation and your integrity and honor and I quote [were] "being used as white chips in a dirty little poker game by dishonorable and corrupt individuals"?

A. I recall that, sir.

 * * * * * *

Q. Do you recall saying that this case from the beginning has been "a tissue of lies"?

. . . .

A. Yes, sir.

Q. Do you still believe those statements are true?

A. Very much so, sir.

Q. You still believe that your conduct lacked even the possible appearance of impropriety?

A. Yes, sir.

Q. It didn't seem just a little bit improper?

A. No, sir.

Q. Not in the least?

A. No, sir.

 * * * * * *

Q. You insist there wasn't a single thing wrong with your conduct?

A. Absolutely.

