[Cite as *Fahey Banking Co. v. Grady & Assocs.*, 2024-Ohio-159.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

THE FAHEY BANKING COMPANY,   :

    Plaintiff-Appellant,   :

                    No. 112417
    v.   :

GRADY AND ASSOCIATES, ET AL.,   :

    Defendants-Appellees.   :

---

**JOURNAL ENTRY AND OPINION**

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 18, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-21-953442

---

*Appearances:*

Cooper Elliot and Barton R. Keyes, *for appellant*.

Mazanec, Raskin, & Ryder Co., L.P.A., Joseph F. Nicholas, Jr., Frank H. Scialdone, and Terrence L. Williams, *for appellees*.

MARY J. BOYLE, J.:

{¶ 1} Plaintiff-appellant, The Fahey Banking Company ("Bank"), appeals the trial court's judgment entry granting defendants-appellees, Grady and Associates and its attorneys, Francis X. Grady ("Attorney Grady") and Andrew Campbell's

(collectively "Grady"), motion for summary judgment, raising one assignment of error for review:

> **Assignment of Error:** The trial court erred by granting [Grady's] motion for summary judgment.

For the reasons set forth below, we affirm the trial court's ruling.

{¶ 2} In September 2021, the Bank refiled a complaint against Grady for legal malpractice. According to the complaint, the Bank is an Ohio corporation and a stock state bank that retained Grady, a "boutique" law firm, and its attorneys who focused on a broad range of transactional and regulatory matters for financial institutions and related entities. Grady was retained to provide legal services to the Bank in connection with various matters, including the review and presentation of consulting agreements and employment contracts for the Bank's executive officers. The complaint states that "at all relevant times, [Grady] represented and had an attorney-client relationship with [the Bank]" and "owed duties to [the Bank], including a duty of care and a duty not to take actions that advanced interests of other to the detriment of [Bank,]" but that "[Grady] at various times took actions to benefit individual officers and directors of [the Bank], to the detriment of [the Bank]" and caused the Bank significant damages. In its second cause of action, the Bank claimed that, based upon Grady's actions, it is entitled to disgorgement. (Bank's Complaint, 09/23/21.) Grady filed an answer to the refiled complaint. Therein, Grady admitted that they represented the Bank and "owed a duty to the [Bank] to act with the degree of skill, knowledge, care, and diligence normally

applied by members of the legal profession under like or similar circumstances." (Grady's Answer, 10/25/21).

{¶ 3} In February 2022, a remote case-management conference was held and the following litigation schedule was set:

1. Plaintiff to provide expert reports by not later than 6/6/2022.
2. Defendants to provide expert reports by not later than 8/5/2022.
3. All discovery is to be completed by not later than 9/19/2022.
4. Dispositive motions to be filed by not later than 10/5/2022.
5. Trial is scheduled for 1/23/2023 at 8:00 a.m.
6. Trial order entered.

(Journal Entry, 02/25/22.)

{¶ 4} On August 5, 2022, Grady filed a notice of identification of a defense expert and produced their expert report. Two months later, on October 5, 2022, Grady filed a motion for summary judgment. The Bank next filed an unopposed motion to clarify briefing schedule, which the trial court granted on November 2, 2022, ordering the parties to follow Civ.R. 6(C) for response times. On November 2, 2022, November 11, 2022, and November 18, 2022, the Bank filed unopposed motions for extension of time in which to file its brief in opposition to Grady's dispositive motion.[1] On December 2, 2022, the Bank filed its brief in opposition. Grady filed its reply brief in support of its summary judgment motion on December 14, 2022. Approximately one month later, the trial court granted Grady's motion for summary judgment. The Bank timely appeals this order.

---

[1] No rulings by the trial court were made on these motions for extension of time.

{¶ 5} In its sole assignment of error, the Bank argues that the trial court erred, as a matter of law, in granting Grady's motion for summary judgment.

{¶ 6} We review a trial court's judgment granting a motion for summary judgment de novo. *Citizens Bank, N.A. v. Richer*, 8th Dist. Cuyahoga No. 107744, 2019-Ohio-2740, ¶ 28. Thus, we independently "examine the evidence to determine if as a matter of law no genuine issues exist for trial." *Brewer v. Cleveland City Schools Bd. of Edn.*, 122 Ohio App.3d 378, 383, 701 N.E.2d 1023 (8th Dist.1997), citing *Dupler v. Mansfield Journal Co., Inc.*, 64 Ohio St.2d 116, 413 N.E.2d 1187 (1980). We, therefore, review the trial court's order without giving any deference to the trial court. *Citizens Bank* at ¶ 28. "On appeal, just as the trial court must do, we must consider all facts and inferences drawn in a light most favorable to the nonmoving party." *Glemaud v. MetroHealth Sys.*, 8th Dist. Cuyahoga No. 106148, 2018-Ohio-4024, ¶ 50, citing *N.E. Ohio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs.*, 121 Ohio App.3d 188, 192, 699 N.E.2d 534 (8th Dist.1997).

{¶ 7} The moving party has the initial responsibility of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claims. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). "To accomplish this, the movant must be able to point to the evidentiary materials of the type listed in Civ.R. 56(C) that a court is to consider in rendering summary judgment." *Id.* These include "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence,

and written stipulations of fact, if any." Civ.R. 56(C). "These evidentiary materials must show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." *Dresher* at 293. After the moving party has satisfied this initial burden, the nonmoving party has a reciprocal duty to set forth specific facts by the means listed in Civ.R. 56(C) showing that there is a genuine issue of material fact. *Id.*

{¶ 8} Grady does not dispute that an attorney-client relationship existed between them and the Bank and that they had professional duties arising from that relationship. Grady argued in their motion for summary judgment that the Bank's legal malpractice fails as a matter of law because it did not produce the requisite expert testimony to establish that Grady breached their standard of care. Grady further asserted that the only competent evidence regarding the standard of care and duty owed were the opinions of their expert, who opined that Grady complied with those duties and satisfied their obligations to provide competent representation to the Bank. Moreover, Grady claimed that the Bank's claim for disgorgement also fails as a matter of law because there is no such claim in Ohio.

{¶ 9} Attached to Grady's motion for summary judgment was the affidavit of their defense expert, Benjamin A. Barnhill ("Barnhill"), a practicing attorney who, for the past 15 years, represented community banks and vendor companies and advised those banks on corporate, transactional, regulatory, securities, governance, change-in-control, and executive compensation matters. The affidavit included a true and accurate copy of Barnhill's expert report and curriculum vitae. In his

report, Barnhill opined that 1) Grady appropriately structured compensation agreements to comply with applicable laws; 2) Grady had a reasonable basis to believe that the compensation agreements were reasonable given the Bank's size, health, and relevant industry; 3) it was reasonable for Grady to rely upon the Bank's board of directors to determine the appropriateness of the compensation agreements and whether to approve them on behalf of Bank; 4) Grady addressed any perceived conflict of interest by seeking and receiving informed approval for the employment agreements from the board; and 5) Grady satisfied their obligation to provide competent representation to the Bank.

{¶ 10} The Bank countered by arguing that summary judgment is not proper in this matter because it set forth specific facts in its brief in opposition showing that it did not need expert testimony to support its causes of action proving that Grady owed a professional duty, breached that duty, and caused the Bank damages. Specifically, the Bank contended that Grady advised Carl Hughes ("C. Hughes"), the Bank's former chief executive officer, and Coleman Clougherty ("Clougherty"), the Bank's former chief operating officer, how to protect their personal interests, negotiate against the Bank, and extend their tenure at the Bank. The Bank explained that an attorney-client relationship existed only between the Bank and Grady, and never with individual executive officers. The Bank argued that Grady's actions clearly violated a lawyer's duty of loyalty because C. Hughes and Clougherty were adverse parties to the Bank, the corporation Grady was representing. The Bank asserted that large amounts of the work Grady performed

and the Bank paid for involved consulting agreements and employment contracts for C. Hughes and Clougherty that were as executive friendly as possible and efforts to ensure the personal interests of these individual executive officers were better served. The Bank claimed that it did not need an expert to establish the standard of care or its breach because it was obvious and within the understanding of a layperson that an attorney should not advise a party on the opposite side of a transaction to his client.

{¶ 11} Contemporaneously with the filing of its brief in opposition, the Bank filed two affidavits, to wit: the affidavit of Barton R. Keyes ("Keyes"), the Bank's current counsel, and the affidavit of Martin J. Hughes, III ("M. Hughes"), the Bank's current president and one of the largest shareholders. In his affidavit, Keyes authenticated and included documents that were produced in discovery, i.e., Grady's written engagement; email correspondence; pre-bill worksheets; letters; employment agreements; and invoices. The Bank quoted specific portions of these documents in its brief in opposition and argued that Grady's statements like "[t]his contract is as CEO friendly as possible" and "your personal interests are better served by a more comprehensive employment contract similar to the sample document I am providing you" supported its position that there was an obvious and ascertainable breach of the standard of care and duty of loyalty because Grady was providing advice to opposing parties. (Bank's Brief in Opposition, 12/02/22.)

{¶ 12} In the other affidavit, M. Hughes averred to his personal knowledge of the following facts:

2.  I am currently employed at [the Bank] as its President and am one of the largest shareholders of the Bank.  My current tenure at [the Bank] began in early 2019.

3.  Both [C. Hughes] and [Clougherty] ("then-management") worked for the bank before their entering into the employment and related agreements in which [Attorney] Grady was involved in 2017.

4.  Even before [Attorney] Grady's representation of [the] Bank began in 2017, I believed the Bank was being poorly run, and that there were serious improprieties that needed to end.  I had been vocal about this to the Board of Directors, to Mr. Clougherty, and to other shareholders.  Ultimately, I wanted to effect a change in the board and change in management consistent with my rights as a shareholder, and always within any legal or regulatory restrictions that might apply.  I undertook efforts to do so.  If successful, these efforts would have resulted in [C. Hughes] and Clougherty no longer holding their positions at the Bank.

5.  Because of my efforts, I was heavily involved in litigation, arbitration, bank regulator proceedings, and other disputes with the Bank under its then-management, as well as disputes with [C. Hughes] that would affect who had authority to vote substantial numbers of shares of [the] Bank['s] stock (in turn potentially affecting the election of directors who select management).  Through those disputes, I came to know of [Attorney] Grady's and his firm's involvement representing the Bank.

6.  I also came to know of a number of improper efforts by then-management, and Defendant counsel to restrain or discourage me and other shareholders who also sought to legally exercise our voting rights to stop prior management from continuing to enrich themselves at the expense of the bank.  For example:

   a.  Then-management and Grady and his firm submitted false allegations to multiple bank regulators suggesting that I had violated the federal Change in Bank Control Act (and the Ohio equivalent), allegedly by crossing a voting threshold of voting rights that required prior regulatory approval.  They supported these allegations with a false record of the level of my voting rights.  They also denied my access to the correct voting rights information by refusing my legal right as a shareholder to inspect the bank records.  They sought an order from the regulator barring me from

participating in the affairs of any financial institution. With my votes barred, [C. Hughes] and Clougherty could not have been removed and would remain in place continuing to receive the lucrative benefits from their management friendly contracts. As a result of these false allegations, I was forced to go through a government investigation, the bank was forced to pay large legal fees to [Attorney] Grady's firm, and then-management remained in place. The investigation only ended much later when I discovered that a component line item in the alleged record submitted by Grady permitted me, with access to the bank records previously improperly blocked, to prove to the regulators that the total voting rights claimed in the documents submitted by then-management and Grady was false.

b. Then-management gave change in control agreements to several manager-level employees who did not have them before. These agreements gave these employees the right to substantial separation pay if, after a change in the majority of the board of directors, the employee leaves for certain reasons. One of those reasons was a material diminution of the authority, duties, or responsibilities not just of the employee, but alternatively of the supervisor to whom the employee reported (i.e., Clougherty or [C. Hughes]). These agreements also lacked noncompete provisions. This created cascading incentives for all management personnel to leave at once after a change in control, thus potentially discouraging efforts to change the board and remove [C. Hughes] and Clougherty from the Bank. They then argued in court that the shareholder vote to remove incumbent management needed to be enjoined because it could result in almost all department heads leaving the bank at once.

c. Two other unrelated [Bank] shareholders with significant holdings were also active in the banking industry. They also voted to remove incumbent management. As soon as they did so, then-management and Grady filed complaints with multiple banking regulators alleging that the other shareholders, too, were violating the Change in Bank Control Act—again seeking to negate their votes that could remove [C. Hughes] and Clougherty. One of these two shareholders was also the President and a director of another bank that was going through a major merger transaction. Grady also filed objections to the merger with several banking regulators alleging that the President/Director was engaging in illegal activities. Again, Grady's allegations against people that opposed the continued

tenure of [C. Hughes] and Clougherty had no merit and the regulators approved the transaction.

d. My mother owned a significant block of [the] Bank['s] stock. Its disposition upon her death was controlled by a trust. The stock beneficiaries under the trust were Robin Hughes (the wife of our brother Paul, who had recently died from multiple sclerosis), as trustee for their children, and me. Robin and her children made clear they intended to vote their shares to change the Board so that then-management could be removed. [C. Hughes], having already received one-third of Natalie's stock, then used his position as co-trustee to refuse to transfer the remaining shares to Robin and me, who sought to change the Board and management, so that we could not vote them. [C. Hughes] also sought in an arbitration to have Paul's children disinherited. Ultimately, the arbitrator removed [C. Hughes] as co-trustee for gross abuse of his fiduciary duty for using his position as trustee to preserve his personal interest in extending his tenure at [the] Bank. [Attorney] Grady and his firm participated in discussions with [C. Hughes]'s litigation counsel, and billed that time to [the] Bank. Also, [C. Hughes], Clougherty, and Grady used the delay to try to amend the bank's Code of Regulations to extend the terms of the incumbent directors to three years — again preserving the time [C. Hughes] and Clougherty could remain at the bank receiving their benefits at the expense of the bank. Again, [Attorney] Grady and his firm billed this time to the [B]ank.

e. For the 2018 shareholder meeting, then-management hired its own inspector of elections and communicated with him before and after the shareholder meeting in response to the inspector's questions about how they wanted him to count the votes. The inspector declared that I had fewer votes than I did, with the effect being that the board (and therefore [C. Hughes] and Clougherty) remained in place. This effect was only undone through litigation, at which point the shareholder meeting was reconvened, the votes counted correctly, the board changed, and prior management was out.

7. If then-management had succeeded in the efforts I describe in paragraph 6, it would have the effect of discouraging or outright preventing me and other shareholders from exercising our voting rights to change the board of directors, which in turn would have prevented [C. Hughes] and Clougherty's removal from their positions

as chief executive officer and chief operating officer. None of the regulatory allegations or other efforts succeeded.

8. I have reviewed invoices submitted by [Attorney] Grady's firm and paid by the [B]ank. These invoices show that large amounts of the work [Attorney] Grady and his firm did, and for which the [B]ank paid his firm more than half a million dollars, were related to [C. Hughes] and Clougherty's employment and related agreements and subsequently to the efforts I describe in paragraph 6. After secretly ensuring that then-management's "personal interests are better served" against the interests of his own client, Grady continued to take wasteful and false actions in the name of his client, but all serving the interest of the same officers of continuing in the positions where there "personal interests are better served" under contracts that are "as [officer] friendly as possible." The vast majority of the nearly $550,000 in fees Grady billed to the bank were for these activities.

9. I have seen nothing in the Bank's records indicating that Grady ever disclosed to the Bank that he had advised [C. Hughes] and/or Clougherty about their personal interests or provided them contracts that were as executive-friendly as possible while representing the Bank in connection with the contracts.

(Affidavit of M. Hughes, 12/02/22.)

{¶ 13} Finally, the Bank claimed that Grady, as the Bank's lawyers, were fiduciaries who owed a duty of undivided loyalty to the Bank. The Bank asserted that

'[c]ourts throughout the country have ordered disgorgement of fees paid or the forfeiture of fees owed to attorneys who have breached their fiduciary duties to their clients by engaging in impermissible conflicts of interest.' *Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 258, 602 A.2d 1277 (Pa. 1992) (citing, e.g., *White v. Roundtree Trans., Inc.*, 386 So.2d 1287 (Fla.App. 1980); *Perl v. St. Paul Fire & Marine Ins. Co.*, 345 N.W.2d 209 (Minn.1984); *Rice v. Perl*, 320 N.W.2d 407 (Minn.1982); *Financial Gen. Bankshares, Inc. v. Metzger*, 523 F.Supp. 744 (D.D.C.1981), *vacated on jurisdictional grounds*, 680 F.2d 768 (D.C.Cir.1982); *Goldstein v. Lees*, 46 Cal.App.3d 614, 120 Cal.Rptr. 253 (1975); and *Zeiden v. Oliphant*, 54N.Y.S.2d27 (Sup.Ct.1945)).

(Bank's Brief in Opposition, 12/02/22.) Quoting Eleventh District, Sixth Circuit, and out-of-state caselaw, the Bank argued that expert testimony was not needed to establish damages because even without proof of separate harm, courts have long recognized disgorgement of money paid to a disloyal fiduciary. *See e.g., In re Estate of Fraelich*, 11th Dist. Trumbull No. 2000-T-0016, 2004-Ohio-4538, 23 ("'A lawyer engaging in clear and serious violation of duty to a client may be required to forfeit some or all of the lawyer's compensation for the matter.' Restatement of Law Governing Lawyers 3d, Section 37. 'Even if a fee is otherwise reasonable,' a fee may still be subject to forfeiture. Restatement of Law Governing Lawyers 3d, Section 37, Comment a."); *Wischermann Partners, Inc. v. Nashville Hosp. Capital LLC*, 6th Cir. No. 21-5326/21-5604, 2022 U.S. App. LEXIS 17133, 12-13 (June 21, 2022), quoting *Crawford v. Logan*, 656 S.W.2d 360, 364 (Tenn. 1983) ("'Misconduct in violation of a statute or acts against public policy, or in breach of an attorney's fiduciary duty to his client, may support a complete forfeiture of fees.'"); *Burrow v. Arce*, 997 S.W.2d 229, 232 (Tex.1999) ("The principal question in this case is whether an attorney who breaches his fiduciary duty to his client may be required to forfeit all or part of his fee, irrespective of whether the breach caused the client actual damages. Like the court of appeals, we answer in the affirmative and conclude that the amount of the fee to be forfeited is a question for the court, not a jury."); *Hendry v. Pelland*, 315 U.S.App.D.C. 297, 73 F.3d 397, 401 (1996) ("[T]o the extent [that clients] sought disgorgement of legal fees, they needed to prove only that [their

attorney] breached his duty of loyalty, not that his breach proximately caused them injury.").

{¶ 14} In their reply brief, Grady included the affidavit of Attorney Grady to further support their motion. In the affidavit, Attorney Grady described his experience as a banking attorney and his knowledge of standard practices within the industry. Attorney Grady confirmed that Grady was retained by the Bank and explained the nature of the work Grady performed, including their role in drafting various agreements for the Bank's executive officers at the Bank's request. Attorney Grady averred that one agreement utilized similar terms from an existing employment agreement and clarified others. Attorney Grady claimed that Grady was required to work with individual executives in the preparation of certain agreements and that this was standard practice in the banking and regulatory industry. Attorney Grady explained that prior to approval, each proposed agreement was presented to the Bank's board for review after drafting was complete and that he prepared summaries for the board's review and met with its members on several occasions to answer questions and address concerns. Attorney Grady averred that the Board, including disinterested members, approved each of the agreements. Finally, Attorney Grady stated that "[t]he executive agreements were in line with other similarly situated Ohio banks" and "[e]ach of [them] were prepared and approved in a manner consistent with [his] practice and the standard industry practice." (Grady's Reply in Support, Exhibit 1: Affidavit of Attorney Grady, 12/14/22.) Grady argued that the Bank's recitation of facts failed to create a genuine

issue of material fact because the statements cited did not establish an actionable conflict of interest, the communications questioned were standard within banking industry practice, and the agreements criticized were approved by the board. Grady also claimed that their representation of the Bank in resisting the change in control pursued by M. Hughes was authorized under Ohio law. Grady further asserted that expert testimony was necessary to establish any alleged breach of duty and a causal connection between the fees Grady charged and the alleged breach.

{¶ 15} It is well settled in Ohio that in order to prevail on a legal malpractice claim, a plaintiff (the Bank) must demonstrate through expert testimony, by a preponderance of the evidence, that the representation of the attorney failed to meet the prevailing standard of care and that this failure proximately caused damage or loss to the client. This court discussed this principle in *Jarrett v. Forbes*, 8th Dist. Cuyahoga No. 88867, 2007-Ohio-5072, ¶ 19, when it summarized the Ohio Supreme Court decision of *Vahila v. Hall*, 77 Ohio St.3d 421, 674 N.E.2d 1164 (1997), stating: "[T]he Ohio Supreme Court defined the elements that must be established to make a case for legal malpractice. The Supreme Court made it clear that there must be a causal connection between the lawyer's failure to perform and the resulting damage or loss." "Because the elements of a legal-malpractice claim are stated in the conjunctive, the failure to establish any one element of the claim is fatal." *Niederst v. Kohrman Jackson & Krantz, L.L.P.*, 8th Dist. Cuyahoga No. 110913, 2022-Ohio-2579, ¶ 18, citing *Estate of Hards v. Walton*, 8th Dist. Cuyahoga No. 93185, 2010-Ohio-3596, ¶ 7, and *Williams-Roseman v. Owen*, 10th Dist. Franklin No. 99AP-871,

2000 Ohio App. LEXIS 4254 (Sept. 21, 2000). Expert testimony is required to sustain a claim of legal malpractice except where the alleged errors are so simple and obvious that it is not necessary for an expert's testimony to demonstrate the breach of the attorney's standard of care. *Hirschberger v. Silverman*, 80 Ohio App.3d 532, 538, 609 N.E.2d 1301 (6th Dist.1992); *McInnis v. Hyatt Legal Clinics*, 10 Ohio St.3d 112, 113, 461 N.E.2d 1295 (1984); *Rice v. Johnson*, 8th Dist. Cuyahoga No. 63648, 1993 Ohio App. LEXIS 4109 (Aug. 26, 1993); *Cross-Cireddu v. David J. Rossi Co., L.P.A.*, 8th Dist. Cuyahoga No. 77268, 2000 Ohio App. LEXIS 5480 (Nov. 22, 2000).

{¶ 16} In the case sub judice, the Bank claims that its failure to produce an expert report supporting its refiled claim of legal malpractice is not fatal given the alleged acts of malpractice by Grady. The Bank asserts that the evidence offered in opposition to Grady's motion for summary judgment documents Grady's disloyalty in advising C. Hughes and Clougherty how to protect their personal interests and negotiate against the Bank, Grady's client. The Bank argues that Grady did not have an attorney-client relationship with any of the Bank's individual executives and had "no conceivable obligation to advise the opposite party." The Bank further claims that Grady did not request or obtain any conflict waivers related to the advice for and negotiation of C. Hughes and Clougherty's employment agreements and contracts. The Bank argues that Grady's actions demonstrate a clear conflict of interest that breached the standard of care. The Bank asserts that this breach is so simple and obvious that it is within the understanding of a layperson. The Bank

argues that the lack of an expert report obviated the need for expert testimony demonstrating that the attorneys owed a duty or obligation to it.

{¶ 17} Grady does not dispute that an attorney-client relationship existed between them and the Bank and that they had professional duties arising from that relationship. Thus, the issues for resolution are whether Grady breached the professional duties owed to the Bank and whether that breach proximately caused damages to the Bank. In order to determine whether Grady breached its professional duties, we need to discuss what duty was owed. "'The duty of an attorney to his client is to "* * * exercise the knowledge, skill, and ability ordinarily possessed and exercised by members of the legal profession similarly situated, and to be ordinarily and reasonably diligent, careful, and prudent in discharging the duties he has assumed."'" *Estate of Hards* at ¶ 9, quoting *Palmer v. Westmeyer*, 48 Ohio App.3d 296, 298, 549 N.E.2d 1202 (6th Dist.1988), quoting 67 Ohio Jurisprudence 3d, Malpractice, Section 9 at 16 (1986).

{¶ 18} To support its argument that an expert is not needed, the Bank highlights dicta from an out-of-state, federal case for the proposition that "[a] person does not need a law degree to understand the conflict that comes from standing on both sides of a transaction * * *." *Nasrabadi v. Kameli*, N.D.Ill. No. 18 C 8514, 2019 U.S. Dist. LEXIS 84266 (May 20, 2019). But ultimately, the Bank relies on *Riley v. Clark*, 4th Dist. Scioto No. 98CA2629, 1999 Ohio App. LEXIS 5436 (Nov. 10, 1999), to substantiate its position that expert testimony was not necessary to establish its legal-malpractice claim against Grady.

{¶ 19} Conversely, Grady argues that the lower court properly granted summary judgment in their favor because (1) the Bank failed to produce the requisite expert testimony and (2) the only competent evidence regarding the standard of care or any alleged breach establishes that Grady satisfied their duty to Bank. Grady claims that the Bank must produce expert testimony to establish that Grady breached the requisite standard of care given the complexities of the claims, allegations, and legal issues raised in this case, which involve the structuring and drafting of contracts and compensation agreements for various bank executives. Grady asserts that any breach of the standard of care in such complex matters is not obvious or within the ordinary knowledge of a layperson. In support of their argument, Grady distinguishes *Riley* and argues that *Northwestern Life Ins. Co. v. Rogers*, 61 Ohio App.3d 506, 512, 573 N.E.2d 159 (10th Dist.1989), is more analogous.

{¶ 20} In *Riley*, plaintiffs filed a legal-malpractice action against their attorney, alleging that their lawyer betrayed their trust by neglecting to inform them that their respective interests were adverse; breached his duty when he failed to advise them of crucial information known to him; and caused harm by advising them to purchase a business, that he secretly owned in part, despite knowledge of the business's extensive financial troubles. *Id.* at 22. After the trial court granted the attorney's motion for summary judgment, the plaintiffs argued on appeal that they presented sufficient evidence of breach of duty and proximate cause and were not required to present expert testimony because the applicable standard of care and

its relation to their injury was obvious even to a lay jury. *Id.* at 20-21. The Fourth District Court of Appeals found that the questions of whether the attorney breached his duty to the plaintiffs and whether he proximately cause their harm was within the jury's general experience and knowledge because the conflict was not complex or unclear: the attorney, as a partial owner of the failing business, profited directly from advising his clients to pay an inflated price for its purchase. *Id.* at 24-25.

{¶ 21} Comparatively, in *Northwestern Life Ins. Co.*, plaintiffs filed a legal-malpractice action against their attorney, alleging that he had a conflict of interest in violation of the Code of Professional Responsibility when he was retained to represent them after they entered into a real estate contract and when he had an interest in the title insurance company involved in the transaction. *Id.* at 161. The Tenth District Court of Appeals held that it was not a case where the attorney's misconduct was obvious from the record and expert testimony was required to support the allegations due to "the very nature and complexity of the Code of Professional Responsibility and the conduct of legal matters." *Id.* at 163-164 ("Expert testimony is required so that the trier of fact does not have to speculate on the standard of care, particularly in a complex case involving real estate transactions which are normally not within the realm of understanding of a layman.").

{¶ 22} We agree with Grady and find that the alleged conflict of interest between Grady, the Bank, and the Bank's executives is not as direct and clear as the conflict in *Riley,* 4th Dist. Scioto No. 98CA2629, 1999 Ohio App. LEXIS 5436, and more akin to complex conflict presented in *Northwestern Life Ins. Co.*, 61 Ohio

App.3d 506, 512, 573 N.E.2d 159.  The Bank's allegations of malpractice against Grady contemplate the communications, strategies, and tactical decisions involved in resisting a change in control and structuring, drafting, and negotiating complex agreements and contracts for the Bank's executives.  The complexity of Grady's alleged malpractice is even more apparent when considering the affidavit of M. Hughes, one of the Bank's largest shareholders and current president.  M. Hughes's tenure began in early 2019, after Grady was retained by the Bank to draft C. Hughes's and Clougherty's employment agreements and contracts.  In the affidavit, M. Hughes described his dissatisfaction with the Bank's operations, even prior to Grady's involvement, and his efforts to put an end to "serious improprieties" by effecting changes in the board and management that were consistent with his rights as a shareholder and within any applicable legal or regulatory restrictions.  M. Hughes detailed the actions C. Hughes, Clougherty, and Grady took to combat his efforts, including suggesting that he violated federal and state banking rules and regulations, creating a false record, filing complaints against shareholders and objections to a merger, attempting to amend the Bank's code of regulations, and hiring their own inspector of elections to prevent shareholders from exercising their voting rights.  M. Hughes further described issues surrounding his family trust and C. Hughes's actions as a trustee and indicated that Grady participated in discussions with C. Hughes's litigation counsel.   The evaluation of such complex matters, like those presented by the Bank and detailed in the affidavit of M. Hughes, are not so obvious and within the general experience or knowledge of a layperson.  *See, e.g.*,

*Niederst*, 8th Dist. Cuyahoga No. 110913, 2022-Ohio-2579 (holding expert testimony was necessary to establish the plaintiff's allegations of malpractice, which involved tactical legal decisions that were more complex than merely missing a court deadline); *Richard C. Alkire Co., L.P.A. v. Alsfelder*, 8th Dist. Cuyahoga No. 104153, 2017-Ohio-1547 (finding expert testimony was necessary to support the plaintiff's legal-malpractice claim because a disciplinary matter before the Ohio Supreme Court was complex and not within the ordinary knowledge of the layman); *Northwestern Life Ins. Co.* (holding expert testimony was required in a complex case involving real estate transactions, the conduct of legal matters, and the Code of Professional Responsibility).

{¶ 23} Moreover, Grady presented evidence in support of their motion for summary judgment, through the affidavits of Attorney Grady and Barnhill, the defense's expert, that Grady's conduct did not breach the standard of care and was consistent with standard industry practices. The Bank did not produce any evidence in its brief in opposition to Grady's motion for summary judgment establishing 1) what the appropriate standard of care is or 2) how Grady's conduct breached that standard. Rather, the Bank summarily concludes that, based on the produced documents and affidavit of M. Hughes, Grady's conduct amounted to obvious malpractice that is simple to understand. We disagree and cannot say that the Bank's legal-malpractice claim is so obvious and within the ordinary knowledge of a lay person that expert testimony is not needed. Rather, due to the complex nature of the banking and regulatory industry and the legal issues and allegations involved

in the Bank's malpractice claim, the Bank was required to present expert testimony to establish its claim that Grady breached its duty to the Bank. Because the Bank did not produce an expert report, it failed to satisfy its reciprocal duty showing that genuine issues of material fact remain as to its legal-malpractice claim. Therefore, the trial court properly granted summary judgment in favor of Grady.

{¶ 24} As argued by Grady, we note that disgorgement is a remedy for a claim, not a claim for relief itself under Ohio law. *Cirino v. Bur. of Workers' Comp.*, 2021-Ohio-1382, 171 N.E.3d 840, ¶ 16 (10th Dist.), citing *Stepak v. Schey*, 51 Ohio St.3d 8, 15, 553 N.E.2d 1072 (1990) (noting that disgorgement is a remedy for breach of fiduciary duty); *Nick Mayer Lincoln Mercury v. Ohio Bur. of Workers' Comp.*, 8th Dist. Cuyahoga No. 93752, 2010-Ohio-2782 (dismissal of complaint was in error where disgorgement was plaintiff's prayer for relief, not its claim for relief); *Wauseon Plaza, Ltd. Partnership v. Wauseon Hardware Co.*, 156 Ohio App.3d 575, 2004-Ohio-1661, 807 N.E.2d 953, ¶ 80 (6th Dist.) ("Our review of Ohio law indicates that disgorgement is an available remedy for a claim of breach of fiduciary duty."). Because we find that the Bank's legal-malpractice claim must fail as a matter of law, it is not entitled to the remedy of disgorgement. Accordingly, we find that the trial court did not err in granting summary judgment in favor of Grady and overrule the Bank's sole assignment of error.

{¶ 25} Accordingly, judgment is affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

ANITA LASTER MAYS, P.J., and
MICHELLE J. SHEEHAN, J., CONCUR